### BROWN, Adm'r, O. P. A., v. NUWAY LAUNDRY CO.

No. 1204.

District Court, W. D. Oklahoma.

Nov. 4, 1943.

O. K. Wetzel and O. B. Martin, Legal Dept., O. P. A., both of Oklahoma City, Okl., for plaintiff.

Ross Lillard and J. B. Dudley, both of Oklahoma City, Okl., for defendant.

VAUGHT, District Judge.

This suit was instituted by the plaintiff March 3, 1943, seeking to enjoin the defendant from violating the General Maximum Price Regulation and Maximum Price Regulation No. 165 issued by the plaintiff by virtue of and under the authority of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 901 et seq. It is alleged the defendant has increased the prices charged for various classes of service it was rendering to the public in March, 1942, above the highest prices charged for such services in said period. The complaint sets out in detail the various classes and character of service so sold and rendered in March, 1942. The defendant denies that it has so violated the regulations, within the purview of the Act.

The constitutionality of the Act has been raised, but in view of the holding in Henderson v. Kimmel, D.C., 47 F.Supp. 635, the question is foreclosed here. Various other questions have been raised by the defendant, which the court deems unnecessary to pass upon, as the case should be determined upon its merits. Has the defendant violated the provisions of Regulation No. 165 as amended, issued under the Act, by charging prices for services rendered and sold in excess of the highest prices charged in March, 1942, for such services? If so, the injunction should be granted; if not, the injunction should be denied.

The plaintiff contends that Congress, in the Emergency Price Control Act, has vested exclusive jurisdiction in the Emergency Court of Appeals (a court created by the Act) to determine the validity of any regulation, order or price schedule or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of the Act, from whose decision an appeal lies to the United States Supreme Court, and that this court is divested of any jurisdiction to consider or determine the same.

Section 205(a) of the Act, 50 U.S.C.A. Appendix § 925(a), provides: "Whenever in the judgment of the Administrator any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act * * *, he may make application to the appropriate court for an order enjoining such acts or practices,. or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent

or temporary injunction, restraining order, or other order shall be granted without bond."

A casual reading of this section is sufficient to enable the court to determine that it was never the intention of Congress, in the enactment of the section, to curtail or limit a court of equity, under the rules, to pass upon the merits of the case brought before it under that statute. Under any other construction the jurisdiction of the court would not be such as to do complete equity in the case. If it should be construed that the court is bound to issue the injunction upon the mere filing of the application of the plaintiff, then the court ceases to be a court and becomes an arm of the Executive Department of the government under the complete control of the Price Administrator. Such a construction was never intended to be placed upon the Act.

If this were an action seeking to invoke the jurisdiction of the court to pass directly upon the validity of a regulation, there could be but one answer. But here we have a different situation, which is also provided for in the Act. Under the Act, the Administrator is given the specific authority, if in his opinion one has clearly violated, or is about to violate, any regulation, to apply to an appropriate court for an injunction against such a violation. The Administrator has invoked the jurisdiction of a court of equity to restrain or enjoin such an alleged violation. The burden is upon him to prove that there has been a violation of the regulation, and in so doing, he is governed by the rules of equity.

In Brown, Adm'r, v. O'Connor et al., 49 F.Supp. 973, 976, the District Court for the Northern District of Texas had the statute under consideration and expressed the principle as follows:

" * * * The big question, therefore, is whether this appeal to equity by the Administrator should be heard by the court because of the failure of the citizen to exercise his right to petition under the act for an increased rental under the new situation of his property.

"Now we have our lawsuit right there. He is given a remedy in the Act. This court has frequently determined for itself, in line with the controlling authorities, that, when the citizen enters court, as the plaintiff, for restraint against an Act, without making use of the Administrative remedy first, that he cannot do so. That is not this case. Cases which deny the citizen that right, in that sort of a case, are not applicable here. Here, the United States comes to the Chancellor. The United States is the plaintiff. It is bounden to make out its case in such a nature as to appeal to the conscience of the Chancellor. If it has not done so, it is not entitled to a decree."

The facts are largely stipulated, and upon other matters not so stipulated, the testimony is uncontradicted. The defendant is engaged in the laundry business and sells its services to the public. The sections of Regulation No. 165, as amended, so far as it is controlling here, are as follows:

"Sec. 1499.101 Prohibition against dealing in services above maximum prices. On and after July 1, 1942, regardless of any contract or other obligation:

"(a) Sales. No 'person' shall 'sell' or supply any of the 'services' set forth in paragraph (c) of this section at a price higher than the maximum price permitted by this Maximum Price Regulation No. 165, as amended."

\* \* \* \* \*

"(c) Services covered. This Maximum Price Regulation No. 165, as amended shall apply to all rates and charges for the following services, except when such services are rendered as an employee:

\* \* \* \* \*

"(36) Laundering (including but not limited to laundry collection and including also but not limited to diaper, linen, towel, uniform or work clothes supply service, with or without laundering.)"

\* \* \* \* \*

"Sec. 1499.102 Maximum Prices for Services: General Provisions. Except as otherwise provided in Maximum Price Regulation No. 165, as amended, the seller's maximum price for any service to which this Maximum Price Regulation No. 165, as amended, is applicable shall be:

"(a) The highest price charged during March 1942 (as defined in this section) by the seller—

"(1) For the same service; or \* \* \*."

\* \* \* \* \*

"(e) Similar services subsequently sold. Any maximum price determined under

paragraphs (c) and (d) of this Section 1499.103 shall be the maximum price for all services subsequently sold by the seller which are the same as or similar to the service for which a maximum price has been so determined, without regard to subsequent changes in cost. * * *.

"For the purposes of this Maximum Price Regulation No. 165, as amended, the highest price charged by a seller during March 1942 shall be:

"(1) The highest price which the seller charged for a service 'supplied' by him during March 1942; or * * *

"The 'highest price charged during March 1942' shall be the highest price charged by the seller during such month to a 'purchaser of the same class'."

\* \* \* \* \*

"No seller shall evade any of the provisions of this Maximum Price Regulation No. 165, as amended, by changing his customary allowances, discounts, or other price differentials."

\* \* \* \* \*

"Sec. 1499.116 Definitions and explanations.

"(a) (10) 'Purchaser of the same class' refers to the practice adopted by the seller in setting different prices for services for sales to different purchasers or kinds of purchasers (for example, wholesaler, jobber, retailer, government agency, public institution, individual consumer) or for purchasers located in different areas or for different quantities or grades or under different conditions of sale."

Among the matters stipulated are the following:

"I. * * * The defendant owns and operates a laundry establishment located at 1104 Linwood Boulevard, Oklahoma City, Oklahoma, known as the NuWay Laundry, Cleaners and Dyers. Said defendant is engaged, among other things, and was during the times involved in this action, in the business of selling laundry, cleaning, dry cleaning and dyeing services to the general public within Oklahoma City, Oklahoma, and vicinity."

\* \* \* \* \*

"IV. During March, 1942, the defendant sold rental linen service where the linens were owned by the defendant corporation, at prices ranging from 55¢ per 100 for napkins and 5¢ per lb. for flat work to 85¢ per 100 for napkins and 8¢ per lb. for flat work, and between November, 1942, and March, 1943, the defendant increased its price of this service to some of its customers and is now charging some of its customers for said service an increase in price per unit over the price charged the same customers for said service in March, 1942, and prior thereto.

"V. The different prices to different customers for commercial flat work service and rental linen service were made and fixed by the defendant because of competition from other laundries and also made and fixed to obtain or hold the customers, or to obtain said customers after they had ceased to patronize the defendant and were obtaining their commercial flat work and rental linen service from competing companies.

"VI. The different prices for commercial flat work service and rental linen service to different customers was by reason of competition of competing laundries.

"VII. The commercial flat work service furnished to each and all of the customers was the same and identical service.

"VIII. The rental linen service furnished to each and all customers was the same and identical service.

"IX. During March, 1942 and prior thereto the defendant sold from its laundry five separate types of bundle services in each of which shirts with collars and cuffs attached were finished. Said bundles showing the amount charged in each are as follows:

"Budget Bundle—Completely Finished— Minimum, 12 pounds for $1.49. Over 12 pounds 9¢ per pound. Shirts finished 8¢ each additional.

"Fluff Dry Bundle—Flat Work all Finished—Minimum 9 pounds for 76¢. Over 9 pounds 7¢. Shirts finished 8¢ each additional.

"Wet Wash Bundle—Everything Returned Damp—Minimum 12 pounds for 49¢. Over 12 pounds 4¢. Shirts finished 10¢ each additional.

"Thrifty Bundle—Flat Work Finished, Wearing Apparel returned damp— Minimum 8 pounds for 49¢. Over 8 pounds 6¢ per pound. Shirts finished 8¢ each additional.

"All Finish Bundle—Everything Finished. Shirts Plain 10¢, 15¢, 20¢, 25¢. Shirts pleated 25¢. Shirts finished DeLuxe 25¢, Silk Shirts 35¢.

"In each of the five types of bundle services above mentioned, the same character of service was performed in finishing shirts with collars and cuffs attached.

"X. On and after March 1, 1943, the defendant increased the price for finishing shirts with collars and cuffs attached over the price charged in March, 1942, as follows:

"Budget Bundle—Pound Price unchanged. Shirts finished increased from 8¢ to 12½¢.

"Fluff Dry Bundle—Pound Price unchanged. Shirts finished each from 8¢ to 12½¢.

"Wet Wash Bundle—Pound price unchanged. Shirts finished each from 10¢ to 12½¢.

"Thrifty Bundle—Pound price unchanged. Shirts finished each from 8¢ to 12½¢.

"All Finish Bundle—Discontinued the 10¢ price. All other prices remain the same.

"XI. During the month of July, 1943, the defendant discontinued selling entirely the services known and designated as the Budget Bundle, the Wet Wash Bundle, and the Thrifty Bundle, and is now not selling or furnishing any of such bundle services. During July, 1943, the defendant also discontinued the finishing of shirts in the Fluff Dry Bundle, and is not now accepting shirts with collars and cuffs attached to be finished when included in said bundle service. In all other respects, the defendant is selling the Fluff Dry Bundle Service at the same price as existed in March, 1942. At the present time the defendant is selling the service of finishing shirts with collars and cuffs attached only in the All Finish Bundle Service.

"XII. The service rendered by the defendant in finishing shirts with collars and cuffs attached in each of its five separate types of bundle services herein referred to was identically the same in March, 1942, and since said date, and is now the same character of service.

"XIII. During March, 1942, and for a period of time of approximately five or six months prior thereto, the defendant customarily extended a discount of 20% to all of its cash and carry customers on all services sold by it requiring a period of three days or longer to perform. This cash discount was discontinued by the defendant in November, 1942, and the said discount is not at this time allowed by the defendant.

"XIV. In connection with the commercial flat work service sold by the defendant herein, at no time has the defendant increased the price of such service to any customer beyond 8¢ per pound. As to the rental linen service sold by the defendant, it has at no time increased the price of such service in excess of the highest price charged by it to a purchaser of this service during March, 1942."

The testimony of P. O. Denham, general manager of the defendant corporation, is in accord with the stipulation. It also discloses an interesting situation concerning the laundry business. The defendant is limited in the wages it can pay its employees, which wages are much lower than such persons can secure in employment in other fields of endeavor. This situation is a disturbing element in the defendant's business, resulting in a one hundred per cent. turnover of employees each month, in having to work with an inferior class of employees, in a shortage of help, and in a disruption of the services sold. Witness' testimony also discloses that an increase in the cost of linens, which forms the basis of the linen service sold, threatens to render that service unprofitable at the ceiling price the defendant charged in March, 1942; that competition in the business is keen and aggressive and is largely responsible for any apparent increase in prices charged for services sold or rendered the public.

The whole controversy seems to be over the prices now charged by the defendant for services sold in finishing shirts with collars and cuffs attached and the prices charged for bundle service in excess of the prices charged in March, 1942. It will be observed that the defendant now sells such services on shirts only in the "all finish bundle." In the services sold in March, 1942, in the "all finish bundle," the prices that could be charged, under the defendant's schedule of prices for the identical service, for shirts ranged from 10¢ to 25¢ per shirt. The evidence discloses that the price range now is from 17¢ to 18¢ per shirt. The highest or ceiling price has not been exceeded.

The Emergency Price Control Act of 1942 is a war measure. The purpose of its enactment is plain, and every care

should be exercised to see that it is properly enforced. But it was not the purpose or intent of the Act to enforce its directives issued thereunder, in such a manner as would force a business to operate at a loss.

The evidence discloses that the defendant, in its effort to meet sharp competition, was rendering the same character of service in different ways to the public in March, 1942, and was charging for such services, prices ranging from 10¢ to 25¢ per shirt. Since the regulations have gone into effect, the cost of materials has sharply increased and the labor situation has become troublesome. The defendant, therefore, has deemed it wise to discontinue certain character of services theretofore sold and rendered to the public and to sell and render the same service only in what it had theretofore designated as the "all finish bundle." In selling and rendering this service, it does not charge in excess of the highest or ceiling price it was entitled to charge for that class of service in March, 1942. It is true that in March, 1943, it increased the price on shirts in the bundles listed in paragraph X of the stipulation to 12½¢ per shirt, but it had a right to do that so long as it did not exceed the highest price charged for such service in March, 1942.

The stipulation discloses that in July, 1943, the defendant discontinued the "budget bundle", the "wet wash bundle", and the "thrifty bundle", and has discontinued the finishing of shirts in what it designates the "fluff dry bundle." The reasons for so doing, the court deems both sufficient and wise.

Where contractual relations are not involved, a court of equity would not be justified in compelling one to perform services at a loss to, and the ultimate impairment or ruin of, his business. The Act was plainly designed for the purpose of holding prices at certain levels for the duration of the war. So long as the ceiling prices charged within the purview of the Act, and directives issued thereunder, do not violate the terms of the Act, or the directives issued thereunder, an injunction should not be granted.

Here we have one class of purchasers of laundered shirts with collars and cuffs attached. The defendant laundry, in catering to that class of trade in March, 1942, fixed a series of prices ranging from 10¢ to 25¢ per shirt. Certainly it had the right to offer for sale such service on such class of laundry to the public at such prices as it desired and deemed good business, in such manner and in as many ways as it saw fit, prior to the enactment of the statute under consideration. The effect of the Act was not to limit the price on such class of laundry to the lowest price charged on such class of laundry in March, 1942, under whatever plan was employed by the seller, but, on the contrary, to charge any price not in excess of the highest price charged in March, 1942. The evidence discloses that the defendant has endeavored, under the conditions that have confronted it, to comply with not only the letter, but the spirit, of the statute, in the conduct of its business.

The injunction should be, and is hereby, denied, to which the plaintiff is granted an exception. A form of judgment may be submitted within ten days from this date.