**BOWLES, Adm'r, Office of Price Administration, v. NU WAY LAUNDRY CO.**

No. 2911.

Circuit Court of Appeals, Tenth Circuit.

Aug. 28, 1944.

Rehearing Denied Oct. 7, 1944.

A. M. Dreyer, Atty., Office of Price Administration, of Washington, D.C. (Thomas I. Emerson, Fleming James, Jr., and David London, all of Washington, D.C., David Love and Amos Coffman, both of Dallas, Tex., and O. B. Martin, of Oklahoma City, Okl., on the brief), for appellant.

J. B. Dudley, of Oklahoma City, Okl. (Ross N. Lillard and Duke Duvall, both of

Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This appeal involves the correctness of a judgment of the District Court holding that the appellee, NuWay Laundry Company, had not violated the Emergency Price Control Act of January 30, 1942, 56 Stat. 23, 50 U.S.C.A.Appendix, § 901 et seq., as amended by the Inflation Control Act of October 2, 1942, 56 Stat. 765, 50 U.S.C.A. Appendix § 961 et seq., or the Maximum Price Regulations issued in pursuance thereof, and denying an injunction authorized by Section 205(a) as prayed by the Price Administrator in a suit specifically charging violations of Maximum Price Regulation 165, as amended. (7 F. R. 4734.)

Acting in pursuance of authority granted by Section 2(a) of the Act, the Price Administrator promulgated Maximum Price Regulation 165 on June 23, 1942. In substance and effect, and as applied to the appellee, the Regulation, as amended, provides that no person shall sell or supply laundry service at a price higher than that charged by the seller for the same or similar service to a "purchaser of the same class" during the month of March 1942, and expressly prohibits the evasion of any provisions of the Regulation, as amended, by changing customary allowances, discounts, or other price differentials. Secs. 1499.101-102.[1] A "purchaser of the same class" was defined and explained as practices adopted by the seller in setting different prices for the same services to different purchasers or kinds of purchasers, or for purchasers located in different areas, or for different quantities or grades, or under different conditions of sale. Sec. 1499.116(10).[2]

The complaint filed by the Administrator on March 3, 1943, charged that as an operator of a laundry and dry cleaning service establishment, the appellee was supplying a service for which maximum prices had been established by Maximum Price Regulation 165, as amended, and had violated the Act in the following particulars: In the month of November, 1942, the de-

---

[1] "Sec. 1499.101 Prohibition against dealing in Services above Maximum prices. On and after July 1, 1942, regardless of any contract or other obligation:

"(a) Sales—No 'person' shall 'sell' or supply any of the 'services' set forth in paragraph (c) of this section at a price higher than the maximum price permitted by this Maximum Price Regulation No. 165, as amended.

"(c) Services covered.—This Maximum Price Regulation No. 165, as amended, shall apply to all rates and charges for the following services, except when such services are rendered as an employee:

"(36) Laundering (including but not limited to laundry collection and including also but not limited to diaper, linen towel, uniform or work clothes supply service, with or without laundering)."

"Sec. 1499.102 Maximum prices for services: General Provisions—Except as otherwise provided in Maximum Price Regulation No. 165, as amended, the seller's maximum price for any service to which this Maximum Price Regulation No. 165, as amended, is applicable shall be:

"(a) The highest price charged during March 1942, (as defined in this section) by the seller—

"(1) For the same service; or

"(2) If no charge was made for the same service, for the similar service most nearly like it;

"For the purpose of this Maximum Price Regulation No. 165, as amended, the highest price charged by a seller during March 1942, shall be:

"(1) The highest price which the seller charged for a service supplied by him during March 1942: or

"(2) If the seller supplied no such service during March 1942, his highest 'offering price' for supply during that month:

"The 'highest price charged during March 1942' shall be the highest price charged by the seller during such month to a 'purchaser of the same class.'

"No seller shall evade any of the provisions of this Maximum Price Regulation No. 165, as amended, by changing his customary allowances, discounts, or other price differentials."

[2] "1499.116 Definitions and Explanations—(a) When used in Maximum Price Regulation No. 165, as amended:

"(10) 'Purchaser of the same class' refers to the practice adopted by the seller in setting different prices for services for sales to different purchasers or kinds of purchasers (for example, wholesaler, jobber, retailer, government agency, public institution, individual consumer) or for purchasers located in different areas or for different quantities or grades or under different conditions of sale."

fendant discontinued a discount of 20 per cent which it had extended to its cash and carry customers in March, 1942, on work for the performance of which three days or longer were allowed. On and after September 22, 1942, defendant increased the prices of its laundry service on commercial flat work over the prices which it charged therefor in March, 1942. After March, 1942, defendant increased the price to a class of customers for its linen rental service over the highest price charged such class of purchasers for such services during March, 1942. On and after March 1, 1943, defendant increased the price of the service for finishing shirts to 15¢ each, being a price in excess of the highest price charged for the same service in March, 1942. A temporary and permanent injunction, as authorized by Section 205(a) of the Act was prayed restraining further violations of the Act.

By answer filed March 12, and amended answer April 1, the appellee admitted the nature of its business, but challenged the constitutionality of the Emergency Price Control Act as an unauthorized delegation of legislative power to the Administrator. It also challenged the validity of the Regulation as inapplicable to its business, and in the alternative alleged that if the Act was constitutional and did cover the appellee's business, the Regulation as sought to be applied went beyond the purpose and scope of the Act and hence not within the power of the Administrator to enforce; that in any event, it was carrying on and doing business in substantially the same manner as in March, 1942, and had not intentionally violated the Act or the Regulation, as amended. On March 13, and April 2, 1943, respectively, the Administrator moved to strike that part of the answer and amended answer which challenged the validity of the Regulation, and in support thereof alleged that the validity of this Regulation could not be tested in the trial court since by Section 204(a) (b) (d) of the Act, exclusive jurisdiction to try the validity of or annul any such regulation was committed to the Emergency Court of Appeals (created by Section 204(c) of the Act).

On March 18, the Administrator moved for a mandatory injunction, requiring the appellee to comply with Regulation 165 (Sec. 1499.108 (b)), by filing with the Oklahoma County War Price and Ration Board a statement showing the description or identification of each type or class of laundry service sold by it during March, 1942, and the highest price for which it sold such services, together with the pricing methods, charges, customary allowances, discounts, or other price differentials in effect during said month. In support of this motion it was alleged that according to an investigation of the State Office of Price Administration, and a written statement of appellee's General Manager, no such statement of maximum prices had been filed and that the records relating to the prices charged were not preserved for inspection by the Administrator as required by Section 1499.108(a), although under the Regulation the same should have been prepared and filed before September 10, 1942. It was specifically alleged that the said acts and practices of the appellee would "irreparably injure and jeopardize" the efforts of the United States to prevent inflation by the stabilization of prices in the interest of National Defense. On April 2, the Administrator applied to the court for an order under Rule 34, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c (see also Sec. 202(b) of the Act), requiring appellee to produce for examination, copying and photographing, certain books and records "material to the matter involved in this action." The record does not reflect that any of these motions were heard or decided until after a stipulation of facts was filed and the case was heard on its merits October 7, 1943.

According to the stipulation, appellee owned and operated a laundry establishment known as the NuWay Laundry, Cleaners and Dyers, and was engaged among other things in the business of selling laundry, dry cleaning, and dyeing service to the general public within Oklahoma City and vicinity, and that on or about September 10, 1942, appellee deposited with "some clerk" of the Oklahoma County War Price and Ration Board a statement of the ceiling prices charged by it for laundry and dry cleaning services during March, 1942; that on March 3, 1943, it was discovered that the said statement had not been executed by the proper officials of the corporation, and at that time it was executed by the Vice-President of the company and filed with the Board as of that date. On October 7, 1943 (the date of trial), appellee filed an amendment to the list heretofore filed with the Board, showing its customary allowances, discounts, and other price differentials in effect during

March, 1942. During this period (March, 1942) the appellee sold "commercial flat work" service to different customers at different prices, ranging from 2¢ to 8¢ per pound, and since November, 1942, it has increased the price for such services to some of its customers, and is now charging an increase in the price per pound over the price charged the same customers for the same service during March, 1942; that during the same base period the appellee sold "rental linen service" to different customers at different prices and between November, 1942, and March, 1943, increased the price for this service to some of its customers, and is now charging an increase per item over the price charged the same customers for the same service supplied during March, 1942. The different prices charged customers for the same service were fixed by appellee to meet competition from other laundries and apparently the price differentials have no other economic basis.

During March, 1942, appellee offered to the public as a part of its laundry service five separate types of bundle service, to-wit: "Budget Bundle"—completely finished —minimum 12 pounds for $1.49, over 12 pounds 9¢ per pound, shirts finished 8¢ each additional; "Fluff Dry Bundle"—only flat work all finished—minimum 9 pounds for 76¢, over 9 pounds 7¢ per pound, shirts finished 8¢ each additional; "Wet Wash Bundle"—everything returned damp—minimum 12 pounds for 49¢, over 12 pounds 4¢ per pound, shirts finished 10¢ each additional; "Thrifty Bundle"—flat work finished—wearing apparel returned damp—minimum 8 pounds for 49¢, over 8 pounds 6¢ per pound, shirts finished 8¢ each additional; "All Finish Bundle"—everything finished. Shirts plain 10¢, 15¢, 20¢ 25¢. Shirts pleated 25¢, shirts finished Deluxe 25¢, silk shirts 35¢. In each of the above five types of bundles, the same type and kind of service was performed in finishing the shirts contained therein.

On and after March, 1943, appellee increased the price for finished shirts over the price charged for the same shirts during March, 1942, from 8¢ to 12½¢ for each shirt in the "Thrifty," "Budget" and "Fluff Dry" bundles, and from 10¢ to 12½¢ in the "Wet Wash" bundle, and discontinued the 10¢ price in the "All Finish" bundle. In other respects the per pound price for each bundle service remained the same. In sum, the price charged for laundrying shirts in each type of service rendered was in-

creased from 8¢ and 10¢ to 12½¢ and 15¢ each. During the month of July, 1943, appellee discontinued entirely the services known and designated as "Budget," "Wet Wash" and "Thrifty" bundles, and at the same time discontinued finishing shirts in the "Fluff Dry" bundle, and is not now accepting shirts with collars and cuffs to be finished in any of the bundle services, except the "All Finish" bundle for which it is now charging from 17¢ to 18¢ per shirt, but never in excess of the maximum of 25¢ stipulated in its schedule of prices in effect during March, 1942, for its "All Finish" bundle service. During the base period, and for a period of six months prior thereto, appellee customarily extended a discount of 20 per cent to its three-day cash and carry customers but the 20 per cent discount was discontinued in November, 1942, and is no longer allowed for any type of service.

In an opinion filed November 4, 1943 (Brown v. Nuway Laundry Co., D.C., 52 F.Supp. 498, 499), the court observed that any question of the constitutionality of the Act had been foreclosed by Henderson v. Kimmel, D.C., 47 F.Supp. 635, and that the question for decision was whether "the defendant violated the provisions of Regulation No. 165, as amended, issued under the Act, by charging prices for services rendered and sold in excess of the highest prices charged in March, 1942, for such services. If so, the injunction should be granted; if not, the injunction should be denied." The court recognized its lack of jurisdiction to "pass directly upon the validity of a regulation," but took the view that since the Administrator had invoked the jurisdiction of a court of equity to restrain and enjoin an alleged violation of the regulation, the burden was upon him to prove the violation and in so doing he was governed by the rules of equity.

Proceeding upon this legal premise the court, after finding the facts as stipulated, held that although a war measure it was not the purpose of the Emergency Price Control Act to compel a business to operate at a loss; that since the regulations had gone into effect the cost of materials had sharply increased and the labor situation had become troublesome, as a result the appellee "deemed it wise" to discontinue various bundle services heretofore sold to the public and to render the same service only in what was designated as the "All Finish Bundle," for which service it charged dur-

ing March, 1942, from 10¢ to 25¢ per each finished shirt and for which it is now charging from 17¢ to 18¢ per shirt. The court reasoned that although it was now charging in excess of the prices charged for the same service during March, 1942, it was not charging in excess of the maximum price charged for finished shirts in the "All Finish Bundle" during this period, and since the "All Finish Bundle" was the only type of service now rendered which included finished shirts the practice was "both sufficient and wise." The court did not treat or decide whether the admitted discontinuance of the 20 per cent discount or the fact that a higher price was charged for "rental linen service" and "commercial flat work" to the same customers for the same service rendered and sold in March, 1942, constituted violation of the Act. It finally concluded that the appellee had endeavored to comply not only with the spirit but with the letter of the Act and the injunction prayed was denied.

■ In arriving at its conclusion, we think the learned trial court confused the legal and equitable questions involved. Whether the appellee violated any of the applicable price regulations is a legal question which the court must decide upon facts presented, and equitable considerations do not enter into that equation. It is of course the province and the duty of the court to determine for itself whether the party sought to be enjoined under Section 205(a) is within the coverage of the Act or Regulation, but in the determination of that question it is not competent for the court to consider the fairness or the equity of any regulation or price schedule established thereby. Such considerations are not within the scope of inquiry committed to the trial court by Section 205(a), under which jurisdiction has been invoked. Any equitable jurisdiction to test the validity of a regulation or the fairness of a price schedule, established thereby, is exclusively committed to a single court created by the Act (Section 204(c)) and specifically authorized, subject to review by the Supreme Court, to adjudge the validity of any regulation, order or price schedule, and to set aside or annul the same. Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339; Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660; Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641.

■ The Administrator having thus shown, according to these narrow legal standards, that the Act or regulation, order or price schedule, has been violated or is about to be violated, it is the duty of the court, to which application is made under Section 205(a), to enforce compliance with such regulation or order by an injunction, restraining order or "other order." Violation of the Act or regulation is not, however, ipso facto grounds for injunctive relief authorized by Section 205(a). The trial court may in the exercise of its equitable discretion find that some "other order" less drastic is appropriate to effectuate the purposes of the Act. But in that regard, courts must not forget that they, in coordination with the administrative agency, have a public duty commensurate with the congressional policy and one which they may not escape without abdicating in favor of some other tribunal more responsive to the public need. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587.

■ Recognizing that "of all the consequences of war, except human slaughter, inflation is the most destructive" (Senate Report No. 931, 77th Congress, 2d Sess., p. 25), the Congress by enactment of the Emergency Price Control Act, expressed its purpose to stabilize prices in order to prevent wartime inflation and its causes and effects, by maintaining existing price levels. To effectuate the declared congressional policy the Act created an office of price administration Section 201(a) under the direction of a price administrator empowered to fix and establish "generally fair and equitable prices" for rents and commodities by appropriate regulations, giving consideration whenever practical to existing rents and commodity prices during certain designated base periods. The constitutionality of the broad and comprehensive powers thus delegated to the Administrator is no longer open to doubt or question. Yakus v. United States, supra; Bowles v. Willingham, supra; Henderson v. Kimmel, supra. Moreover, since the Administrator is empowered to fix and establish prices by promulgation and adoption of appropriate regulations he is also authorized to interpret such regulations for the guidance of those amenable to the Act and regulations, and such interpretations, if not controlling, are entitled to great weight so long as they do not distort or pervert the plain intendment of the Act. Cf. Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 325, 53 S.Ct. 350, 77 L.Ed. 796.

The admitted discontinuance of the 20 per cent discount for cash and carry three-day service; the increase in the price for "rental linen service" and "commercial flat work" over the prices charged some of its customers for the same service during March, 1942; the increase in the price for finishing shirts in each of the bundle services and the subsequent discontinuance of each of these bundle services except the "All Finish" and "Fluff Dry" bundles and the rendition of the same service (finishing shirts) to the same customers only in the "All Finish Bundle" at a price in excess of the maximum charged in any of the discontinued services constituted an overall increase in prices for the rendition and sale of the same services to the same customers during March, 1942, and to that extent operated to promote inflationary tendencies in derogation of the large objectives of the Act. But the Act is not to be construed to require any person to sell or offer for sale any commodity or service, Section 4(d), and the regulations do not preclude the increase of prices for services rendered within the maximum prices for which such services were rendered and sold to a "purchaser of the same class" during the designated base period. Our inquiry then is whether the admitted increases are within the permissible latitude of the Act and applicable regulations.

The appellee increased the price of "rental linen service" and "commercial flat work" to some of its customers over the price charged the same customers during the month of March, 1942, but it did not charge these customers in excess of the maximum prices charged other customers purchasing the same service during the same period, and if all such customers may be classified as "purchaser of the same class" within the meaning of the Regulation (1499.102) the appellee has not violated the Act in respect to the sale of this particular type of service, although it has increased the price of service to some of its customers over the price charged during the base period.

In addition to the definition of the phrase "purchaser of the same class" contained in Section 1499.116(10) (see Note 2), the Administrator on September 22, 1942, further construed and specifically applied that phrase to the rendition of laundry service in the following language "if a laundry customarily charged two customers different prices at the same time the two customers are in a separate class even if one customer sometimes paid more than the other and sometimes less." O.P.A. Service 11:969. In other words, the test is not necessarily whether customers were purchasing the same service in the same area during the same period of time, but whether the said purchasers were paying the same prices for the same services during the base period. With this construction we are in accord, and it follows that when the appellee sold "rental linen service" and "commercial flat work" to a particular customer or customers at a particular price, it thereby created a class within the meaning of the Regulation (1499.102), and by that Regulation it is forbidden to charge this class of customer or customers in excess of the maximum prices charged that class during the base period. When judged by these standards the appellee had admittedly violated the Regulation in respect to the "rental linen service" and "commercial flat work." By the same test, the purchasers of each of the designated bundle services offered for sale during March, 1942, constituted a separate class and the appellee is forbidden by the Regulation to charge a price in excess of the maximum price charged for the rendition of these various types and classes of service. Of course, the appellee can discontinue any of these types of bundle service without offending the Act or regulations, but it cannot thereby evade the plain purpose of the Act and regulations by selling the same services under different classifications at prices in excess of the maximum charged for the same class of service during March, 1942.[3] Buckeye Parking Corp. v. Bowles, Em.App., 141 F.2d 692.

In July, 1943, appellee discontinued all the bundle services except the "Fluff Dry"

---

[3] Section 1499.670, issued the 26th of November 1943, provides: "Refusing to supply lower priced services. (a) A seller who is subject to Maximum Price Regulation No. 165 and who discontinues a service that he offered in March, 1942, or since, and sells or offers to sell in its place a higher priced service is evading the Emergency Price Control Act of 1942, as amended, and is violating Maximum Price Regulation No. 165. No seller shall engage in such practice unless it appears that one or more of the following conditions exists: * * *" This interpretation is not retroactive or binding here but it supports our interpretation of regulation 165.

and the "All Finish" bundles and did not thereafter render the same services under any other type or classification. In that respect it did not violate the Act or any regulation. It continued to sell the "All Finish" service, including finished shirts for which it charged 17¢ to 18¢, which was in excess of the 10¢ minimum charged for the same service during the base period, but not in excess of the maximum of 25¢ which it also charged during the base period. From the stipulation and the testimony adduced, we are unable to determine whether the variant prices charged for the same services in the "All Finish Bundle" constituted a separate class. We, therefore, hold that the appellee did not violate the Regulation by the elimination of the minimum price established in that particular class of bundle service.

The appellee did not, however, discontinue the "Fluff Dry Bundle" service but discontinued laundrying shirts as a part of that service and offered in its place the same service in the higher priced "All Finish Bundle." In that respect we think appellee plainly violated the Regulation.

■ Similarly, the appellee continued to offer the three-day cash and carry service, but discontinued the 20 per cent discount, thereby increasing its prices to this class of customers for the same services rendered during March, 1942, in violation of the Regulation.

■■ The question remains whether an injunction, authorized by Section 205(a) of the Act should issue. This suit was filed March 3, 1943, and at that time the Administrator prayed for temporary and permanent injunctive relief. Thereafter he sought without avail to compel appellee to comply with the regulations but his efforts were met with recalcitrant non-compliance. The case was finally decided December 15, 1943, approximately ten months after its commencement. The objectives of the Act cannot be served unless courts promptly perform the judicial functions enjoined upon them by the Act. If the hardships recognized by the trial court as constituting the basis for a denial of the injunction are disproportionate to the common burden of a wartime economy the remedy is adequately provided elsewhere in the Act (Sections 203(a) and 204(a) (b) (c) (d) and not in the trial court. The complexities of the problem involved in such a gigantic undertaking renders judicial administration in-

adequate and inappropriate. In our judgment the public interest fully justified injunctive relief in respect to the adjudicated violations and the case is reversed and remanded with directions to issue an injunction in accordance with the views herein expressed.