## UNITED STATES v. WALTON MOTORS.

### Civ. No. C–27–52.

United States District Court
D. Utah, Central Division.
Aug. 13, 1953.

George M. McMillan, Special Asst. U. S. Atty., Salt Lake City, Utah, for plaintiff.

Robert G. Partridge, San Francisco, Cal., and Louis H. Callister and Nathan J. Fullmer, Salt Lake City, Utah, for defendant.

WALLACE, District Judge.

The plaintiff, the United States of America, brings this civil action to recover damages from the defendant, Walton Motors, a corporation of Salt Lake City, Utah, for the defendant company's alleged violations of price stabilization regulations issued pursuant to the Defense Production Act of 1950, as amended.[1]

The alleged violations can be divided into two general classes. The first group

has to do with section 4(c) of Ceiling Price Regulation 83;[2] this section provides in part:

"You may not make a charge for extra, special or optional equipment unless the request for such equipment is made to you by the customer in writing. The request in writing may be the order form customarily used by you and signed by the customer."

It is undisputed that in all new car sales between March 2, 1951, and January 12, 1952, the defendant company sold the following "package items" along with the cars sold without obtaining from the customers a written request for such items:

(1) Oil bath air cleaner

(2) Oil filter

(3) Wheel trim rings

(4) Directional turn indicator signal

(5) Glove compartment light

(6) Luggage compartment light

The issue is whether the just-mentioned items should be deemed standard or "extra, special or optional". Obviously, if such items, as a class, are standard equipment, no written request by the purchaser was necessary and all sales within this group were not in violation of the regulations.

The purpose of section 4(c) was to give each customer the opportunity to decide just what optional equipment, if any, should be attached to the new car being purchased. Thus, the purchaser was to be protected from being required to buy a number of expensive optional accessories in order to get delivery on a new automobile at a time when the automobile market was exclusively a seller's market. There was no intention that the regulation require an added ministerial act to complete an order for extra, special or optional equipment; the sole object was to prevent a "loading on" of unwanted expensive accessory equipment.[3]

1. 50 U.S.C.A.Appendix, § 2061 et seq.

2. Hereinafter referred to as CPR 83.

3. That such was the purpose is confirmed by section 16 of CPR 83 which states: "*Evasion.* (a) No person subject to this regulation shall charge directly or indirectly a price above the applicable ceiling price in connection with any sale of a new automobile. Any device by which you increase your total realization on the sale of a new automo-

The evidence indicates that without exception the automobiles were shipped from the factory to the defendant company with the package items installed. The defendant company had no choice in regard to whether or not these items accompanied the cars shipped. These package items were part and parcel of the automobiles as they left the factory and such items for the most part were either necessary for the proper care and operation of the vehicles, or at least highly desirable.

■ Although Special Order 6, effective December 13, 1951, and Special Order 13, effective January 29, 1952, designate that these package items now before the Court fall within the category of "extra, special or optional" the Court does not choose to follow such orders. These orders, which in practical effect are interpretations, although persuasive and entitled to great weight are not binding upon this Court where the Court finds such orders to be in conflict with and contrary to the express meaning of the regulation.[4] Logically, if the defendant company had "loaded up" the various new cars sold with radios, heaters, overdrives and other accessories unmistakably extra, special and optional, as commonly understood, the regulation would have been violated.

■ Although there is evidence, in the form of several letters, that the Ford Motor Company considered the package items as factory installed extra, special or optional equipment, the dealer's order forms together with their accompanying columns printed to aid the dealer in ordering *optional* equipment include only the following items:

(1) Radio

(2) Heater

(3) Overdrive

(4) White sidewall tires

(5) Automatic transmission

(6) Fender shields

(7) Automatic window lifts

(8) Mountain axle ratio

(9) Convertible top

The items just listed are optional in every sense of the word. Significantly, no opportunity was given the dealer to determine how many, if any, of the package items were to be shipped. Each car ordered came with the package equipment attached. The dealer had no choice but to receive the package equipment whereas that equipment which was truly optional was specifically requested by the dealer.

To exact a penalty from the defendant company in regard to this class of equipment which for all practical purposes is "standard" and which was received by all purchasers at ceiling prices without complaint would be to do utter violence to the moving spirit of the Defense Production Act as well as CPR 83 issued thereunder. The Government's requested application flies into the teeth of reason and logic.

bile over the ceiling price established by this regulation is an evasion of the regulation. (b) *Specific practices.* The following practices are specifically, but not exclusively, among the practices prohibited by paragraph (a) of this section and are itemized here only to lessen the frequency of interpretative inquiries which experience indicates are likely to be raised under the general evasion provision: * * * Requiring the purchaser to purchase extra, special or optional equipment, accessories, parts or services or any other commodity in order to receive delivery of a new automobile." Cf. Sullivan v. Porter, 5 Cir., 1947, 160 F.2d 648.

4. Cf. United States v. Ericson, D.C.Minn. 1951, 102 F.Supp. 376, 382.
    In Bowles v. Seminole Rock & Sand

Co., 1944, 325 U.S. 410, 412, 413, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, the Court said: "Since this [problem] involved an interpretation of an administrative regulation, the court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. The intentions of Congress or the principles of the Constitution in some situations may be relevant in the first instance in choosing between various constructions but the ultimate criterion is the administrative interpretation, which becomes of controlling weight *unless it is plainly erroneous or inconsistent with the regulation.*" (Emphasis supplied.) The Court in the instant case considers the special orders inconsistent with the plain meaning of the original regulation.

█ Although patently this is a civil action, the Government's cause of action is penal in nature and any ambiguity should be construed in favor of the defendant, particularly where the entire conduct of the defendant, such as the one herein, evidences absolute good faith.

The second class of alleged violations by the defendant has to do with whether the defendant company violated the governing regulation in the charges it made for "preparing and conditioning" the new cars for delivery in connection with the sales in issue.

Section 3 of General Ceiling Price Regulation, Supplementary Regulation 5, effective March 2, 1951,[5] provided in substance that the ceiling delivered price for a new automobile for sale at retail should be the sum of the following amounts:

(1) The manufacturer's suggested list price.

(2) A charge for extra, special or optional equipment requested in writing by the customer.

(3) Transportation costs.

(4) Federal excise taxes.

(5) State and local taxes.

(6) The ceiling price established under the General Ceiling Price Regulation for preparing and conditioning the new automobile for delivery.

(7) Any other service, requested in writing by the customer, which is ordinarily performed on new cars by the seller.

The "base period" under SR 5 was from December 19, 1950, to January 25, 1951. The Statement of Considerations in SR 5 includes:

"During the base period established by the General Ceiling Price Regulation, many retail dealers in new automobiles were not following any uniform practice in fixing the delivered prices of new automobiles. Some dealers added arbitrary amounts to the manufacturer's suggested retail price. Others increased the charge for services supplied in preparing the automobile for delivery. Still others increased their charges for miscellaneous services, such as undercoating, glazing, etc. As a result, the ceiling prices for new automobiles do not reflect the substantial uniformity of pricing in the same geographical area that customarily existed.

"*This regulation is designed to correct the lack of substantial uniformity in the established ceilings and to correct evasive practices. * * *"* (Emphasis supplied.)

To accomplish the desired objectives CPR 83 was issued to become effective October 15, 1951. The formula spelled out in CPR 83 was composed substantially of the same factors mentioned in section 3, SR 5; in addition, the following was said:

"Sec. 7(a) The charge for preparing and conditioning the new automobile for delivery shall be your charge for preparing and conditioning prevailing during the period January 26 to February 24, 1951, but not in excess of 5 percent of the basic price of the automobile, * * * The preparing and conditioning charge must be directly related to services actually rendered in preparing the new automobile for delivery. If no services are rendered you can make no charge for preparing and conditioning. The preparing and conditioning charge does not include advertising charges or any other charge which represents an item not directly a part of the preparation for delivery."

To help determine the exact amount which could be charged in regard to preparing and conditioning, Interpretation No. 2 of CPR 83 was issued June 5, 1952 (17 F.R. 5117) and stated in part:

"Inquiries received from various automobile dealers indicate there is some question as to whether those dealers who did not show on their sales invoices or other records their charge for preparing and conditioning a new car for delivery during the period January 26, to February 24, 1951, but whose selling price during the period.

5. Hereinafter referred to as SR 5.

included such a charge, may make a charge for preparing and conditioning under the provisions of Section 7 of Ceiling Price Regulation 83.

\* \* \* \* \* \*

"A dealer who made no charge for preparing and conditioning during the period January 26, to February 24, 1951, is not now permitted to make a charge for such services under the provisions of Section 7."

The last paragraph of this Interpretation provided that in the event the dealer could not separate his charge for preparing and conditioning from the total selling price in any of the first three ways suggested (which are inapplicable in the instant case) that

"he may use his cost of preparing and conditioning the automobile for delivery as shown by his books of account for that period as a measure of his charge under Section 7. In looking to his costs for preparing and conditioning the automobile for delivery, he must look only to the costs of those services that are directly related to preparing the automobile for delivery (as stated in Section 7). For example, he may not include the cost of advertising, warehousing, periodical checkups, floor planning, or 'any other charge which represents an item not directly a part of the preparation for delivery' as a part of the cost he uses for measuring his charge."

Not only must the charge have been made during the base period but the records must clearly demonstrate that such a charge was made during the base period.[6]

■ The evidence establishes that during the base period the defendant company charged a specific markup the amount of which varied with the make, line and series of the automobile being sold.[7] However, there is no convincing evidence that this margin was in anyway directly related to "preparing and conditioning". The pertinent regulation required that the amount of the charge relate directly to services rendered. The underlying purpose of the regulation was to achieve some uniformity of prices among all dealers and was not to merely guarantee that the individual dealer might obtain the highest price received on a comparable automobile during the base period.

That there was no direct relationship between the amount of the markup and services actually rendered is emphasized by the fact that the identical charges were made for those cars delivered at the factory and those delivered in Salt Lake City. The additional margin, although possibly including some expense in connection with preparing and conditioning, did not fall within the scope of the regulation giving the defendant company the right to charge this additional margin during the period in issue.

As indicated in section 7 of CPR 83, "the preparing and conditioning charge must be directly related to services actually rendered in preparing the new automobile for delivery \* \* \*", and as mentioned in paragraph 4 of Interpretation No. 2 of

6. See General Ceiling Price Regulation, § 16. The government witness Mr. Grether testified:

"Q. State the conversation, Mr. Grether. A. I asked Mr. Sorensen if his records anywhere would show the preparation and conditioning by individual car, or the cost pertaining to it or any other records by which I might identify this preparation-conditioning charge. He informed me that the company had no records which would show that information by individual cars."

\* \* \* \* \* \*

"Q. Were you ever furnished any documents at Walton Motor Company from the financial, fiscal records of the corporation for any period of time prior to January 1, 1952, in which preparation and conditioning or words of similar import were used? A. I was never furnished any documents or shown any records that indicated the preparation and conditioning charge as such individual item or separate item." (tr. 104)

7. All Mercury Automobiles_____ $145.38
   Lincoln Automobiles:
       Six-Passenger Coupe _____ 175.00
       Capri Coupe _____ 183.50
       Sedan _____ 177.50
       Convertible _____ 211.00

CPR 83 must not include "the cost of advertising, warehousing, periodical check-ups, floor planning, or any other item not directly related to preparation and conditioning for delivery".

■ Although under CPR 83, Revision 1, effective August 23, 1952, the complained of acts probably would not constitute 'violations inasmuch as the regulation was revised to take into account "historical practices" of the dealers, this revision comes too late to be of benefit to the defendant company in the present suit.

Revision 1, in no way is retroactive and a close reading of the Statement of Considerations evidences that a complete change in policy took place; such a change carried with it no implication that the prior unrevised regulation was invalid or unenforceable.[8]

■ Although Revision 1 appears to be a much more intelligent as well as equitable approach to the pricing problem, such a fact even if true is immaterial insofar as the instant case is concerned; the sole function of this Court is to apply the regulation as promulgated. The Court can neither deprive an unambiguous regulation of its plain meaning and purpose[9] nor question the regulation's validity.[10]

The Court hereby specifically finds:

1. This is a civil action brought to recover damages for violations by defendant company of price stabilization regulations issued pursuant to the Defense Production. Act of 1950, as amended. This Court is vested with jurisdiction by virtue of 50 U. S.C.A.Appendix, § 2109 and 28 U.S.C.A. §: 1345.

2. The defendant is a Utah corporation with its principal place of business in Salt Lake City, Utah, within the territorial limits of the jurisdiction of this Court.

3. Acting pursuant to the Defense Production Act of 1950, as amended, Executive Order 10161 (15 F.R. 6105), and Economic Stabilization General Order No. 2 (16 F.R. 738), the Director of Price Stabilization issued SR 5 (16 F.R. 1769, et seq.) The regulation became effective March 2, 1951, and was in force and effect through October 14, 1951.

4. Acting pursuant to the authority mentioned in finding No. 3, supra, the Director of Price Stabilization issued CPR 83 (16 F.R. 10594). Said regulation became effective October 15, 1951 and was in effect to and including August 22, 1952. Said regulation superseded SR 5.

5. The defendant company did not violate any of the governing regulations by failing to obtain a written request from purchasers in connection with the sale of the "package items", inasmuch as said items were standard and not "extra, special or optional" as used in the regulations. The "package items" include:

8. Not only was there a change in policy but there was a need to harmonize the regulation with the Herlong Amendment to the Act, effective June 30, 1952. See in particular 50 U.S.C.A.Appendix, § 2102 (k).

9. Bowles v. Case, 9 Cir., 1945, 149 F.2d 777; Bowles v. Wheeler, 9 Cir., 1945, 152 F.2d 34, certiorari denied 326 U.S. 775, 66 S.Ct. 265, 90 L.Ed. 468.

10. 50 U.S.C.A.Appendix, § 2108(d) provides: " * * * The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation or order relating to price controls issued under this title, and of any provision of any such regulation or order. * * *"

As mentioned by the Court in Bowles. v. Nu Way Laundry Co., 10 Cir., 1944,. 144 F.2d 741, 746, certiorari denied 323. U.S. 791, 65 S.Ct. 431, 89 L.Ed. 631, in construing a similar provision in the Emergency Price Control Act of 1942,. as amended, "Whether the appellee violated any of the applicable price regulations is a legal question which the court must decide upon facts presented, and equitable considerations do not enter into that equation. It is of course the province and the duty of the court to determine for itself whether the party sought to be enjoined under Section 205 (a) is within the coverage of the Act or Regulation, but in the determination of that question it is not competent for the court to consider the fairness or the equity of any regulation or price schedule established thereby. * * *"

(1) Oil bath air cleaner

(2) Oil filter

(3) Luggage compartment light

(4) Glove compartment light

(5) Directional turn indicator signal

(6) Wheel trim rings

6. The defendant company did not make any charge for preparing and conditioning a new car for delivery during either of the periods December 19, 1950 through January 25, 1951 or January 26, 1951 through February 24, 1951.

7. Between March 1, 1951 and March 31, 1952, the defendant was guilty of charges in excess of the maximum ceiling price totaling $20,863.17.

8. The overcharges by the defendant company were neither wilful nor the result of a failure to exercise practicable precautions.[11]

9. The Government is not entitled to recover an attorney's fee.[12]

10. The transactions complained of herein transpired more than thirty days since the filing of the complaint in this action and no suit for damages has been filed by said purchasers; these transactions did not arise because defendant acted upon and in accordance with the written advice and instructions of the President of the United States or an official or employee authorized to act for him, nor did such transactions arise out of the sale of material or service to any agency of the Government, pursuant to the lowest bid made in response to an invitation for competitive bids.

The Government is entitled to judgment for $20,863.17.

Counsel should submit a journal entry which conforms with this opinion within fifteen days.

11. Thus, under 50 U.S.C.A.Appendix, § 2109(c)(2) the Government is only entitled to recover the amount of the overcharges without penalty.

12. Although the amount of $3000 requested by the Government is in and of itself very reasonable by the standards of a private practitioner, the Court does not believe Congress in section 2109(c) intended to give the Government a right to receive an attorney's fee where the action was brought by a salaried government attorney. The provision permitting a reasonable attorney's fee doubtless was meant to encourage the individual buyer to bring an action to recover for the overcharge, and has no application where the Government elects to bring suit.