**WALTON MOTORS, a corporation,**
**Appellant,**
v.
**UNITED STATES of America,**
**Appellee.**
No. 4805.

United States Court of Appeals
Tenth Circuit.
Oct. 29, 1954.

**390**

Nathan J. Fullmer, Salt Lake City, Utah (Louis H. Callister, Salt Lake City, Utah, was with him on the brief), for appellant.

Katherine Hardwick Johnson, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., and Melvin Richter, Atty., Department of Justice, Washington, D. C., were with her on the brief), for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

The United States brought this action against Walton Motors, a corporation engaged in the retail automobile business, to recover statutory damages for violation of ceiling price regulations GCPR–SR–5 (15 F.R. 1769 et seq.) promulgated under the provisions of the Defense Production Act of 1950 as amended 50 U.S.C.A.Appendix, § 2061 et seq., and Economic Stabilization General Order No. 2 (16 F.R. 738). The regulations provide that if a retail automobile dealer had made a charge for "preparing and conditioning" new automobiles for delivery during the established base periods, this charge could be included in the ceiling price. The trial court held that the defendant did not make a charge for preparing and conditioning new cars during the base periods, and that the inclusion of such charge violated the law and the regulations fixing a maximum ceiling price. The court also held that the overcharges were not wilful or the result of failure to exercise practicable precautions, and it entered judgment in favor of the United States in the sum of $20,863.17. D.C., 114 F.Supp. 83. The only question presented by this appeal is whether the finding of the trial court that the defendant made no charge for conditioning and preparing new cars during the base periods in question is clearly erroneous.

Walton Motors was a franchised dealer in Lincoln-Mercury automobiles, and was engaged in the retail sale of such automobiles at Salt Lake City, Utah. In 1950, and thereafter, it was subject to regulation under the Defense Production Act of 1950. The first General Ceiling Price Regulation became effective on January 26, 1951, and it froze the retail prices for which defendant could sell new automobiles at the highest level of its prices in effect during the period December 19, 1950 to January 25, 1951. This regulation was superseded on March 2, 1951, by GCPR–SR–5 (Retail prices for new and used automobiles, 16 F.R. 1769). On October 15, 1951, SR–5 was superseded by CPR–83 (16 F.R. 10594).

Section 3 of SR–5 established as the basic ceiling price for new automobiles, the sum total of (a) the manufacturers' suggested list price; (b) a charge for extra, special, or optional equipment requested in writing by the customer; (c) transportation costs; (d) Federal excise taxes; (e) State and local taxes; (f) the ceiling price established under the General Ceiling Price Regulation for preparing and conditioning the new automobile for delivery; and (g) any other service, requested in writing by the customer, which is ordinarily performed on new cars by the seller. We are only concerned with paragraph (f) which related to the charge "for preparing and conditioning the new automobile for delivery". It is quite clear that in preparing the regulations, the Director of Price Stabilization recognized that this charge is a proper one and that it is an element of the retail price. The purpose of SR–5 and CPR–83 was to establish uniformity in the fixing of retail prices of new automobiles in the same geographical areas. This might, to some extent, effect a change either up or down in prices existing during the base periods. George V. Tribe Co. v. Kendall, Em.App., 210 F.2d 658; Norman-Frank, Inc., v. Arnall,

Em.App., 196 F.2d 502. CPR–83 provided that the ceiling price should be composed of the same factors as contained in SR–5, except that the charge for preparing and conditioning new automobiles for delivery was to be the same as that charged during the period from January 26 to February 24, 1951, but not to exceed five percent of the basic price of the automobile. It provided that the charge had to be directly related to services actually rendered, and that if no services were rendered, no charge would be allowed.[1]

From August 23, 1952, until the termination of price controls on new automobiles, the selling price was fixed by CPR–83–Rev. 1, issued August 18, 1952. This regulation limited the dealer to the charge for "delivery and handling" which he had had in effect during the period from January 26, 1951, to February 24, 1951, or from May 24, 1950, to June 24, 1950. The term "delivery and handling" as used in this last regulation appears to be synonymous with the term "preparing and conditioning" as used in previous regulations.

The record makes it clear, and it was understood by the Director, that a charge for preparing and conditioning a new automobile for delivery by a retailer is a well-established item of cost. The evidence is uncontradicted that the defendant made such a charge, and that a uniform amount for such service was added to the retail price of each automobile sold during the base periods. The amount was added without exception to the price list of all new automobiles which the defendant offered for sale. The item was not designated as such on the defendant's permanent books, but it was included in the over-all price of each automobile as reflected on the books of the defendant and could be computed by considering all of the factors that went to make up the listed price. The trial court took the view that because the charge was not specifically shown as such on the defendant's books, it was nothing more than a markup in the price and had no relation to services rendered for preparing and conditioning. We think the evidence is clearly to the contrary.

The president of the defendant testified that he had been in the automobile business for thirty years and that during this time it was a standard practice to make a charge for preparation and conditioning of a new automobile for delivery. He stated that "It's a part of the cost of that automobile". Although the amount might vary, it was a customary charge in the business. He further testified that during the periods in question, the charge was made and was the same for all cars of the same type. The uncontradicted evidence shows that in making up the price lists for automobiles, a specific charge for conditioning and preparation was included. Typewritten price lists were prepared showing a charge for this service, copies of which were introduced in evidence. Prior to the time the regulations became effective, the defendant kept its books in accordance with instructions from the Ford Motor Company. During that time, a dealer was not required to separately show this charge on his permanent books, but could keep his books and ordinarily run his business as he saw fit. The Director of Price Regulations realized that this situation existed in the trade and that

---

1. Section 7(a) of CPR–83 provides:
   "Charge for preparing and conditioning new automobiles for delivery.
   "(a) The charge for preparing and conditioning the new automobile for delivery shall be your charge for preparing and conditioning prevailing during the period January 26, to February 24, 1951, but not in excess of 5 percent of the basic price of the automobile, until a specific preparation and conditioning charge is established by the Director in a Special Order. The preparing and conditioning charge must be directly related to services actually rendered in preparing the new automobile for delivery. If no services are rendered you can make no charge for preparing and conditioning. The preparing and conditioning charge does not include advertising charges or any other charge which represents an item not directly a part of the preparation for delivery."

many dealers were experiencing difficulty in establishing from their books the amount of the charge which they had made during the applicable base period. In order to assist the dealers in determining the amount which had been charged, Interpretation 2 of CPR–83 was issued on June 5, 1952. This Interpretation recited that it was issued as a result of inquiries received by the O.P.S. from various automobile dealers, indicating that there was some question as to whether those dealers whose sales invoices or other records did not show their charge for conditioning and preparing a new car for delivery during the base period, could make such a charge under the provisions of Section 7 of CPR–83. Obviously, the very purpose of the Interpretation was to broaden the method of proving that the charge had been made, if in fact a charge had been made, and not to restrict such proof. It set forth the methods by which a dealer could establish the charge if it was not separately stated on his books. It permitted proof in accordance with its terms regardless of the time of an alleged violation, and of necessity it referred back to the time of the base period. Paragraph 2 of this Interpretation provided that "If the charge does not appear in his invoices, but it appears separately stated anywhere in his books of account or other records, that is the charge he will use under Section 7." Copies of the price lists introduced in evidence show that the defendant made a charge of $145.38 and $161.25 respectively on new Mercury and Lincoln automobiles which were sold during the base periods. That these charges were made by the defendant during the base period was shown by copies of price lists submitted by it, and was corroborated by the testimony of witnesses and the fact that the defendant's books showed that there was included in the price of each automobile a uniform charge equal to the amount claimed. This latter charge could be computed by adding all other factors that went into making up the cost of the automobile and subtracting it from the total cost of each automobile.

From the beginning of price control on automobiles, the Director sought a fair and equitable method of allowing such a charge. When Section 7 of CPR–83 was adopted, it was indicated that the method provided therein was temporary, and that it was to remain in effect only "until specific preparation and conditioning charge is established by the Director in a special order." The specific charge was never fixed by special order, but the statement in the Regulation illustrated the attitude of the Director as to the necessity for the allowance of such an item in the retail price.

■ The contention that there is no proof that the charge was related to any service performed in preparing and conditioning new automobiles for sale is without merit. The evidence shows without contradiction that a certain amount of work is necessary to be performed on every new car prior to delivery; and that the amount of such work varies with each car. The president of the defendant testified to this work in detail. He said that the defendant had from two to four employees doing nothing but making inspections on new automobiles before delivery, together with making repairs and servicing them. The evidence shows that there was an extensive predelivery inspection and report made on both Lincoln and Mercury automobiles. This inspection included sixty-one separate and distinct items on the ordinary automobile. If an automobile had a hydra-matic transmission, there were ten other predelivery checks to be made. In some instances, the inspections did not disclose the necessity of any substantial amount of adjustment or repair. On others there was much work to be done. After an automobile was delivered, there were two additional separate inspections required and if adjustments and repairs were necessary they were made without cost to the customer. These adjustments and repairs were made as recommended by the manufacturers and also to satisfy complaints of customers. This was the service which

the defendant rendered for the preparation and conditioning charge.

The price regulations, we think, were designed to allow a charge in the ceiling price of new automobiles for conditioning and preparation, if such a charge had been made by the dealer during the established base periods. The Regulations provided that in case of new businesses, the dealer was entitled to include an amount equal to that made by the nearest dealer selling like automobiles. The intent of the Regulations was to allow the charge if any reasonable proof could be obtained, not only from the permanent books of the dealer, but from any of his records.

The evidence is undisputed that the defendant in this case made such a charge. It can only be denied the right to include the charge in the ceiling price of its automobiles by the application of technical rules relating to its inability to prove the amount from its books and records. We believe, however, that there was sufficient evidence to satisfy the requirements of the regulations.

Judgment reversed, and the cause remanded with instructions to dismiss the complaint.