B. R. WALDRON & SONS CO, INC., ET AL., PROSECUTORS, v. MILK CONTROL BOARD OF THE STATE OF NEW JERSEY ET AL., DEFENDANTS.

Submitted October 11, 1943—Decided January 5, 1944.

Before Justices PARKER, HEHER and PERSKIE.

For the prosecutors, *Edward M. Currie.*

For the defendant Milk Control Board, *Anthony M. Hauck, Jr.*

. . The opinion of the court was delivered by

HEHER, J. Prosecutors challenge two orders, Nos. 43-7 and 43-8, promulgated on July 19th, 1943, by the Honorable Arthur F. Foran, State Director of Milk Control, after a public hearing on notice to the parties in interest, and affirmed by the Milk Control Board on August · 3d, 1943, following the hearing *de novo* of an appeal taken by prosecutors, prescribing $3.83 per hundredweight as the "minimum price to be paid to producers for Class I milk," as defined in the existing regulations, *i. e.,* milk used primarily for drinking purposes. By other regulations, the state was divided into five marketing areas, Nos. 1 to 5, inclusive. Order No. 43-7 applies to areas 3, 4 and 5, comprising all the counties north of Mercer County, and No. 43-8 applies to areas 1 and 2, embracing Mercer County and all the counties to the south thereof. There is a common minimum price; the differences otherwise have no importance here. These orders were made in the purported exercise of the authority conferred by chapter 274 of the laws of 1941. *Pamph. L., p.* 713; *N. J. S. A.* 4:12A–1, *et seq.* Orders issued the prior May 17th, Nos. 43-3 and 43-4, fixed the same minimum price, but on the hearing of an appeal taken by the present prosecutors to the Milk Control Board, the orders were withdrawn for want of due notice of the proceedings.

In his determination of facts incorporated in both sets of orders, the director found that the price of $3.60 per cwt., set by his orders Nos. 42-1 and 42-2, effective February 5th, 1942, "is, in view of economic conditions, too low for the proper operation of the industry;" and in his findings embodied in Orders Nos. 43-3 and 43-4, he also certified that the proofs established to his satisfaction that the "minimum price which should be paid to producers" for milk of this particular class "should be at least $4.10 per hundredweight to maintain a sufficient supply of milk in New Jersey," but that the Federal Office of Price Administration had barred "an increase greater than 23c. per hundredweight to the producers," and would permit "no increase in the prices to be paid by consumers." There was no such conclusion in

the orders under review. By amendment G-7 to Maximum Price Regulation No. 329, effective May 5th, 1943, the Federal Office of Price Administration granted an increase of 23c. per cwt., or ½c. per quart, in the "ceiling" or maximum price to be paid to producers for this type of milk, or a total of $3.83 per cwt., but allowed no increase in the resale price to be charged by the dealers and processors.

Prosecutors all conduct an intrastate business. They are either "milk dealers" or "processors," as defined in section 1 of the cited statute. The former class comprises wholesalers, while the latter includes both wholesalers and retailers. Both purchase milk from producers, and pasteurize and bottle it. Processors sell "only to or through subdealers, milk dealers or other processors," while milk dealers "sell" or "distribute" milk, purchased or received on consignment from producers, "to consumers or stores or other milk dealers or processors, * * * except for consumption on the premises of the producers." It is prosecutors' insistence, in brief, that they will be unable to "absorb" the additional cost thus placed upon them, without a corresponding increase in price to their subdealers and the consumers, and that this burden will result in their economic ruin.

There is no contention that the increase of price in favor of the producers, considered in the light of production costs, is unwarranted or in any degree excessive. Indeed, it is said that it is "definitely established" by the proofs that the increase thus granted is insufficient "to maintain production of milk in this state," and therefore will not subserve the statutory purpose, and so the orders are void. It is pointed out that since the making of the pre-existing orders, production and operating costs have risen substantially, both for the producers and the milk dealers and processors, and are still rising. It is stated that the price of milk to the consumer has increased but 19% since the year 1939, while other foodstuffs have advanced in price approximately 46%, and that the consumers' purchasing power has been augmented sufficiently to enable them to bear the enlarged production costs. And it is urged that these particular regulations are "arbi-

trary, capricious and discriminatory," and bear no reasonable relation to the essential object of the statute, in that they will render it impossible for the distributors to continue business, except at a substantial loss, and yet will provide a "wholly inadequate sum" for the producers. This is termed a formula based upon an unsound economy in disservice of the policy of the statute. Recognizing that thereby the minimum price was merely raised to the level of the maximum price fixed by the subsisting federal regulation, the latter is likewise denounced as vicious in the same particulars. It is also asserted that the regulations are ,confiscatory, and therefore contravene the Fourteenth Amendment of the federal constitution and article I, paragraph 1, of the state constitution.

But it was plainly not the province of the Milk Director to withhold this economic measure, indispensable to the production of an adequate supply of wholesome milk, merely because of incidental detriment to some of the distributors wholly beyond his power to redress. The production and distribution of milk are intimately identified with the health and welfare of the people; and the business is therefore affected with a public interest warranting price and marketing regulation. *State Board of Milk Control* v. *Newark Milk Co.*, 118 *N. J. Eq.* 504. It is the imperative duty of the director to enforce the statutory policy. It is his paramount function to safeguard the sources of milk through the exercise of the means laid down in the statute. He is empowered to take such measures, including the fixation of prices, as may be necessary "to control or prevent unfair, unjust, destructive or demoralizing practices which are likely to result in the demoralization of agricultural interest in this state engaged in the production of milk or interfere with the maintenance of a fresh, wholesome supply of sanitary milk for the consumers of this state;" and to fix such minimum prices in the trade "as will best insure a sufficient quantity of fresh, pure and wholesome milk to the inhabitants of this state," and, for this purpose, he is under a duty to consider, *inter alia,* the "conditions affecting the cost of production, cost of transportation and marketing, and the amount necessary to

yield a reasonable return to the producer and to the milk dealer, processor or sub-dealer." *Chapter* 274 *of the Laws of* 1941 (*Pamph. L., p.* 713), *sections* 21, 22; *N. J. S. A.* 4:12A–21, 4:12A–22.

As respects the distributors, the director's statutory power is subject to the "ceiling" price prescribed by the Federal Office of Price Administration. This federal regulation is a measure deemed essential to our national war economy * * * an application of a policy designed to avert ruinous inflation and scarcity of a commodity essential to the common defense and security; and in this field the authority of the Congress is supreme. *Vide* 56 *Stat.* 23, *ch.* 26; 50 *U. S. C. A. App.* 901, *et seq.* If distribution is complicated by the federal regulation, and thereby some of the distributors cannot carry on business at a profit, recourse must needs be had to the federal tribunal charged with the administration of the policy. It is not a valid objection that the state price regulation, constituting as it does the fullest measure of relief within the director's power, does not reach beyond his jurisdiction into the field exclusively occupied by the federal government. It is not the function of the state courts to pass upon the wisdom or economic soundness of the federal policy. It is to be said, however, that a notable achievement in the maintenance of the integrity of our national economy during the emergency of war has been the arresting, by this means, of the all but irresistible trend toward uncontrolled inflation. Moreover, on the showing made, we are not convinced that the distributors may not earn a reasonable profit under the regulations in question, if practical economies are effected.

But it is maintained that the exercise of this overruling federal power has completely superseded the state regulations, and the orders are therefore wholly void as an excess of jurisdiction. The argument is that the state regulations "are nullified so long as the federal regulations are in force," and the state administrative agency has "no right to fix prices while the overriding federal authority is acting in New Jersey."

This point, too, is without force. The federal bureau has

merely prescribed ceiling or maximum prices—a limited measure of price control. It has but fixed a level above which prices may not rise. Under the ceiling the state authority is free to function within the framework of the state law. There is a field of concurrent power in which the state may legislate until the authority is actually exercised by the Congress. *Stellwagon* v. *Clum,* 245 *U. S.* 605; 38 *S. Ct.* 215; 62 *L. Ed.* 507. When the Congress legislates in a field common to both the federal and state sovereignties, the federal act supersedes all inconsistent state legislation. *United States* v. *Rock Royal Co-operative,* 307 *U. S.* 533; 59 *S. Ct.* 993; 83 *L. Ed.* 1446; *Jennings* v. *United States Fidelity and Guaranty Co.,* 294 *U. S.* 216; 55 *S. Ct.* 394; 79 *L. Ed.* 869; 99 *A. L. R.* 1248. But an act of Congress may occupy only a limited portion of the field of legislation as regards a particular subject-matter. The decisive question is whether the federal act, fairly interpreted, is in actual conflict with the law of the state. *Savage* v. *Jones,* 225 *U. S.* 501; 32 *S. Ct.* 715; 56 *L. Ed.* 1182. The Congressional purpose to suspend the exercise of the police power of the states must be indubitably manifested. In the application of the principle of supremacy of an act of Congress, where the state law is but the exercise of a reserved power, especially the police power, the repugnance or conflict "should be direct and positive, so that the two acts could not be reconciled or consistently stand together." *Reid* v. *Colorado,* 187 *U. S.* 137; 23 *S. Ct.* 92; 47 *L. Ed.* 108. An intention wholly to exclude state action will not be implied unless, when fairly construed, an act of Congress is clearly in conflict with the state regulation of the same subject. *International Shoe Co.* v. *Pinkus,* 278 *U. S.* 261; 49 *S. Ct.* 108; 73 *L. Ed.* 318.

Plainly, the federal tribunal did not design, by the particular regulation, to assume, as an emergency war measure, total and exclusive jurisdiction of the price and the marketing of milk.

The further contention is made that the orders are fatally deficient, in that there are no findings "in respect to the

proper minimum prices to be paid producers for Class I milk," and that "a certain minimum price is necessary in order to carry out the purposes of the act," and that "this price is necessary to assure an adequate supply of milk for the inhabitants of this state and to maintain the milk supply."

This criticism is captious. The orders recite that "the issue here raised is the fixing of minimum prices to producers for Class I milk pursuant to the provisions of the statute, *Pamph. L.* 1941, *ch.* 274;" that the "cost of operation of producers," as respects both labor and material, had substantially increased during the prior year; that the Federal Office of Price Administration had raised the ceiling price of such milk 23c. per cwt.; and, as stated, that the price fixed by the pre-existing orders for milk of this type is now "too low for the proper operation of the industry." This constitutes a substantial compliance with the requirement of section 20 of the cited statute that all orders and determinations of the director shall include the "findings of fact" upon which they are rested. The findings must reveal a sufficient basis in the statutory considerations for the order made; and this is so here.

And there is no merit in the contentions that the Milk Control Board, in its affirmatory orders, failed to make "a separate finding of facts," and that two of the three members were disqualified, in that they appeared at the public hearing held by the Milk Director in this particular matter and "participated" therein by "asking questions and making statements," and thereby "sat" in the proceedings reviewed by the board. The doctrine of *In re Hudson County,* 106 *N. J. L.* 62, is invoked.

As to the first point, the findings are much more specific than those made by the director, and clearly disclose that the orders are in conformance with the statutory policy. And the members of the Board were not under the asserted disqualification. They were not witnesses in the proceedings before the director, and they did not participate in the determination made by him. Nor did they there express any opinion respecting the subject-matter of the inquiry. The

board conducted •a hearing *de novo;* and there is no basis whatever for the conclusion that the issues did not receive the unbiased and disinterested consideration and judgment of the challenged members.

What was done here is not a commendable practice. Members of an appellate body should refrain from any part in the proceedings of the inferior tribunal. Such participation tends to give rise to the suspicion of bias and settled preconceptions inconsistent with the existence of the open mind that is essential to a fair and dispassionate review. But no harm was done here.

The orders are accordingly affirmed, with costs.