### UNITED STATES v. ERICSON et al.
#### Civ. No. 3904.

United States District Court
D. Minnesota, Fourth Division.
Dec. 27, 1951.

378

C. U. Landrum, U. S. Atty., and Alex Dim, Sp. Asst. U. S. Atty., St. Paul, Minn., for plaintiff. .

J. A. A. Burnquist, Atty. Gen. and Irving M. Frisch, Asst. Atty. Gen. for State of Minnesota, for defendant Ericson.

Edward J. Callahan, Minneapolis, Minn., for defendant Rose Lang.

Reginald Ames and Ray Cummins, St. Paul, Minn., Samuel Maslon, Minneapolis, Minn., Frederick P. Memmer, Milton H. Altman, St. Paul, Minn., amici curiae.

JOYCE, District Judge.

Plaintiff brings this action seeking an injunction against the Liquor Control Commissioner for the State of Minnesota and Rose Lang, owner of the Tower Liquor Store, a retail liquor establishment in Minneapolis, to enjoin violations of Office of Price Stabilization regulations issued pursuant to the Defense Production Act of 1950, as amended, 50 U.S.C.A. Appendix, § 2061 et seq. Motion for a preliminary injunction filed with the complaint on November 14, 1951, was argued on December 14, 1951, during the course of which the court heard the testimony of Mr. Maxwell, a special investigator for the Office of Price Stabilization, and Miss Ethel Hecht, manager of the Tower Liquor Store. In addition affidavits were filed in support of the motion and one in opposition thereto by Dudley C. Ericson, Liquor Commissioner.

In brief the complaint alleges that acting pursuant to the Defense Production Act of 1950, the Director of Price Stabilization on January 26, 1951, issued a General Ceiling Price Regulation (GCPR) which at all times pertinent to the matters here involved still is in full force and effect, establishing as ceiling price for all commodities and services, except those specifically exempted, the highest price at which the seller sold the commodity or rendered the service to the purchaser of the same class during the base period from December 19, 1950 to January 25, 1951; and that for the purpose of setting the pattern of a complete set of tailored regulations establishing ceiling prices for sales by all sellers of both domestic and imported distilled spirits and wines he issued on October 1, effective October 8, 1951, Ceiling Price Regulation 78; that this regulation

does not by itself set ceiling prices but from time to time supplementary regulations are issued explaining how sellers are to calculate ceiling prices for the sale of liquor and wine; that Supplementary Regulation 2 to CPR 78 was issued on October 31, 1951, and becomes effective January 1, 1952, unless the retailer selects an earlier date between October 31, 1951 and January 1, 1952; that CPR 78 and SR 2 to CPR 78 will definitely be the successor regulations to GCPR, beginning January 1, 1952.

The complaint further alleges that Dudley C. Ericson, hereinafter referred to as the Commissioner, as Liquor Control Commissioner is an officer of the State of Minnesota, vested by Chapter 400 of the Laws of Minnesota 1951, M.S.A. § 340.97 et seq., with certain regulatory powers over distilled liquors and wines in Minnesota, including the power to enforce as minimum consumer resale prices uniformly throughout Minnesota the prices quoted by the wholesalers and brand owners to the Commissioner and published by him in a minimum consumer resale price list effective July 1, 1951; that he has issued certain regulations and a minimum consumer resale price list effective July 1, 1951, requiring retailers of distilled liquor and wines in Minnesota to sell distilled liquors and wines at not less than the minimum consumer resale prices therein set forth, regardless of the ceiling prices established for such distilled liquors and wines by GCPR, CP 78 and SR 2 to CPR 78.

It is further alleged that since July 1, 1951 and up to the present the defendant Lang and other retail liquor dealers have sold and delivered and intend to sell and deliver liquors and wines in accordance with the rules and regulations of the Commissioner and at prices in excess of the ceiling prices established by GCPR. Plaintiff seeks to enjoin the Commissioner and all in active concert with him from enforcing Chapter 400 or establishing prices in excess of the ceiling prices established by GCPR as amended. A like order is sought against defendant Lang enjoining her from sales at prices in excess of the ceilings established by the Federal regulations cited.

In her separate answer the defendant Lang denies a violation of GCPR and she alleges that to the best of her knowledge the prices of retail liquor sold in her store did not exceed the highest price obtained for it during the period between December 19, 1950 and January 25, 1951; that she has conformed to Chapter 400 of the Laws of Minnesota 1951 and the Minimum Price List published in accordance therewith. She further alleges that SR 2 to CPR 78 has superseded GCPR and changed entirely the method of computing the sale price of liquor under OPS regulations; that ceiling prices under said regulations went into effect January 1, 1952, or at such prior date as may be elected by the retailer subsequent to October 31, 1951, and prior to January 1, 1952; that to determine the price at which liquor may be sold in accordance with said regulations involves a great deal of clerical work and that she is presently engaged in making such computations; that the issuance of injunctive relief now would be unreasonable and would result in depriving defendant of her property without due process of law. She further alleges that brand owners and wholesalers from whom she purchases liquors and wines are indispensable parties in this action for the reason that they establish the prices published by the Commissioner; and that if the regulations of the Government of the United States as they are sought to be applied here are in some particulars in conflict with the Laws of Minnesota, said regulations are in those particulars of no force and effect, but are beyond the legislative power of the Government and an invasion of the sovereignty of the State of Minnesota and its constitutionally retained powers and a violation of the 21st Amendment to the Constitution of the United States and the powers specifically exercised thereunder in Chapter 400 of the Minnesota laws.

The separate amended and re-amended answers of defendant Commissioner deny that he sets the minimum retail price at which liquor or wine may be sold by the

off-sale retailers and alleges that their prices are set by the brand owners and wholesalers in the price schedules the Minnesota Act requires them to file with him; that said brand owners and wholesalers have made no exceptions in the price schedules which they have filed with this defendant to enable any off-sale retailer to comply with his price ceilings in any case where his price ceiling is lower than the minimum retail price set forth in the price schedule; that said brand owners and wholesalers are indispensable, necessary and proper parties and without them this court has no jurisdiction. He further alleges that to the extent the Defense Production Act of 1950 is in conflict with the Laws of Minnesota, it is repugnant to the United States Constitution as violative of the Fifth, Tenth and Twenty-first Amendments; and that to the extent there is conflict between the Federal Regulations relating to liquor and the State law set forth in Chapter 400, the former are invalid.

The defendant Commissioner also counterclaims seeking injunctive relief against plaintiff restraining the enforcement and operation of the Defense Production Act insofar as it is repugnant to the United States Constitution by reason of its conflict with the laws of Minnesota, and prays for a hearing and determination of this controversy by a district court of three judges, in accordance with the procedure set forth in 28 U.S.C.A. § 2284.

At the close of the testimony defendants made numerous motions to dismiss, both on the ground that the facts showed no violation of the price regulations and on the various grounds asserted as defenses in the answers. The court shall treat the various points raised in what it regards as the proper sequential order.

1. Both defendants argue that the action of the plaintiff is premature inasmuch as the complaint does not charge a violation of SR 2 to CPR 78, the only regulation they contend is now in effect. They urge that SR 2 to CPR 78 in effect suspends the operation of GCPR and that inasmuch as they have not yet finished their computations of the ceiling prices under the new regulation there can be no determination now whether there is such a violation. SR 2 promulgated on October 31, 1951, was therein declared to be effective on January 1, 1952 unless the retailer selects an earlier date between October 31, 1951 and January 1, 1952. They contend that GCPR has been rendered ineffective by virtue of the issuance of CPR 78 and SR 2 to CPR 78 and that they are without any restrictions insofar as the Federal regulations are concerned.

The court fails to understand or follow this line of argument in view of the clear language used in the regulations. Section 1 of GCPR provides that: "The purpose of this regulation is to establish ceiling prices for all commodities and services (except those specifically exempt) upon the basis of prices in effect during the period December 19, 1950 to January 25, 1951, inclusive. This period is referred to as the 'base period'."

This regulation was approved January 26, 1951, and was effective immediately by its own terms.

Section 1 of SR 2 to CPR 78 provides in part: " * * * As a result of this supplementary regulation retail sales of imported packaged distilled spirits and wines by the sellers covered herein are no longer governed by CPR 31. In addition, both wholesale sales of those imported items, and retail and wholesale sales of domestic packaged distilled spirits and wines by the sellers covered herein are no longer governed by the General Ceiling Price Regulation (GCPR)."

Section 80 of SR 2 to CPR 78 provides that the effective date of SR 2 for all items is January 1, 1952, but that a dealer may select any earlier effective date between October 31, 1951 and January 1, 1952. It may be that defendants have misinterpreted the language used in Section 1 of SR 2 to CPR 78 and believed that GCPR had been nullified thereby. However, the court regards it as clear that GCPR is in effect until January 1, 1952, or whatever earlier date is selected by the retailer, and that CPR 78 and SR 2 to CPR 78 are successor regulations. This being true, there is ample authority for the court to enjoin the violations of existing and future regula-

tions. See Bowles v. Royal Wine & Liquor, 7 Cir., 155 F.2d 137, and cases cited therein. I would like also to call attention to Section 706 (b) of the Defense Production Act, the latter portion of which provides as follows: " * * * The termination of the authority granted in any title or section of this Act, or of any rule, regulation, or order issued thereunder, shall not operate to defeat any suit, action, or prosecution, whether theretofore or thereafter commenced, with respect to any right, liability, or offense incurred or committed prior to the termination date of such title or of such rule, regulation, or order."

2. Having determined then that there is in existence a regulation controlling the prices at which defendant Lang may sell, the next question is whether there has been a violation of the ceiling prices computed under that regulation. GCPR, section 3, provides as follows: "Sec. 3. *Ceiling prices for all sellers of commodities or services sold in the base period.* Your ceiling price for sale of a commodity or service is the highest price at which you delivered it during the base period to a purchaser of the same class. If you did not deliver the commodity or service during the base period, your ceiling is the highest price at which you offered it for base period delivery to a purchaser of the same class. The offer must have been made in writing and communicated to a substantial number of customers but in the case of a retailer may have been made by display."

As stated above, the base period is between December 19, 1950 and January 25, 1951, inclusive.

The special investigator for the OPS, checking on a complaint of overcharge, called on the Tower Liquor Store and talked with Miss Hecht, the manager. To determine whether the prices charged were in compliance with OPS regulations he asked her for a list or records showing the highest prices charged during the base period. No such records being available, the investigator was furnished with the charge or credit records of the store for the period December 19, 1950 through July 1951 and a portion of those in August, 1951. He took the charge slips for the period from December 19, 1950 through January 25, 1951 and from these he computed the highest prices charged on certain selected representative brands, both on a cash and carry basis and on a delivered basis. He was informed by Miss Hecht that the prices charged subsequent to the base period and prior to July 1, 1951 were the same prices charged during the base period and that no sales were made during that period which were in excess of the base period prices. Miss Hecht testified that the credit customers are charged the shelf prices and that charge sales represent about twenty to twenty-five per cent of the total sales in dollar volume, but that credit customers represent only about one-tenth of their total number of customers. She freely admits that since July 1, 1951 they have been charging on all sales the prices set forth in the Minnesota Minimum Consumer Resale Price List. The prices listed thereon for the representative brands selected by the investigator are before the court in the affidavits and in the summary of the computations made by the investigator. The court does not propose to review each brand or item separately in this order. It suffices to say that on a number of the sample brands selected the selling price, beginning July 1, 1951, both on a cash and carry and on a delivered basis, is considerably higher than that charged during the base period, and is, therefore, in excess and violative of the ceiling price established by GCPR.

Defendant Lang, however, contends that the evidence conclusively shows that the prices as computed by the investigator were not the highest prices charged by the Tower Liquor Store during the base period. Miss Hecht states that prior to July 1, 1951 the customary policy had been to take the resale price suggested by the wholesaler, but if other stores sell lower they immediately meet such prices and the "cut rating" starts. The prices suggested by the wholesalers were read to the court and were in many instances higher than the prices under the Minnesota Minimum Consumer Resale Price List. In addition, Miss Hecht testified that at the time she spoke to the investigator she did not remember to tell him of their practice of "upping their prices around Christmas time to cater to the 'Basket-

trade'". It is, and has been for a number of years their practice, she says, to make up a basket containing assorted kinds of liquor, apparently as a gift basket. The basket is suitably decorated and the customer purchasing these baskets is charged separately for the basket. In addition, the price of the individual bottles going into the basket is higher than that of identical bottles on the shelf. It is these higher prices, the court is led to believe, which were not considered by the OPS investigator when he computed the highest prices charged during the base period. The evidence tends to show that only in the Christmas basket sales did the price ever reach that suggested by the wholesaler. Defendant's argument is that any attempt to refer to basket purchasers as being in a different "class" is invalid because there is no distinction in the liquor trade among its customers, and therefore the highest price charged for the commodity is controlling,—in this case the price charged for the bottle in the basket sales. Section 22, GCPR defines Class of Purchaser or Purchaser of the Same Class: "This term refers to the practice adopted by a seller in setting different prices for sales to different purchasers or kinds of purchasers (for example, manufacturer, wholesaler, shopper, retailer, Government Agency, public institutions or individual consumer) or for purchasers located in different areas or for purchasers of different quantities or grades or under different terms or conditions of sale or delivery."

The court is of the opinion that in selling basket arrangements the defendant thereby created a class and under price regulations it could not, in determining the highest prices charged on individual items sold to other customers, consider or use the prices charged this class of purchasers. There is ample authority to sustain this interpretation. See Bowles v. Nu Way Laundry, 10 Cir., 144 F.2d 741; Bowles v. Livingston, 5 Cir., 157 F.2d 800; United States v. Utica Knitting Co., 2 Cir., 168 F.2d 620. The Director of Price Stabilization has so interpreted the regulation and such interpretation though not controlling, is entitled to great weight so long as it does not distort the plain intendment of the Act.

Bowles v. Nu Way Laundry, supra. The showing in support of the application for preliminary injunction is sufficient to warrant its granting as to the defendant Lang.

3. It is immediately apparent that an injunction against defendant Lang alone places her in the position of being forced to violate the provisions of the Minnesota law, exposing her to penalties therefor, unless the Commissioner is likewise restrained from enforcing the provisions of the Minnesota Act with respect to minimum prices insofar as they are in conflict with the prices set under the OPS regulations. But defendant Commissioner asserts that he is not engaged in the sale of distilled liquor or wines and has not violated any law or regulation relative thereto, and that therefore, the court does not have jurisdiction over the Commissioner under the provisions of the Defense Production Act, although it may have such jurisdiction under the Judicial Code, Section 1345, on the ground that the United States may have a cause of action against him based upon the supremacy of federal law over state law. It may be well at this point to call attention to certain provisions of the Laws of Minnesota 1951, Chapter 400, M.S.A. § 340.97 et seq.

Sec. 340.97 states it to be the policy of the state of Minnesota that it is necessary to regulate and control the manufacture, sale, and distribution of distilled liquor and wine within the state for the purpose of fostering and promoting temperance in their consumption and respect for an obedience to the law. These regulations and control are deemed necessary to eliminate price wars which unduly stimulate their sale and consumption and disrupt the orderly sale and distribution thereof.

Section 340.972 deals with schedule of prices.

Section 340.973 provides by whom the schedule of prices shall be filed with the Commissioner on or before June 1, 1951 to become effective July 1, 1951, and includes brand owners and wholesalers.

Section 340.974 deals with the requirements of publication and posting of the filed schedules.

Section 340.975 forbids sales at less than retail list price.

Section 340.976 deals with rules which the Commissioner is authorized to promulgate.

Section 340.977 provides that any licenses or municipal liquor store violating the provisions of Section 340.97 to 340.978 shall be guilty of a misdemeanor. A mandatory penalty of suspension of license is provided upon conviction for the violation of any of the above provisions, and for a third offense the Commissioner may suspend, cancel or revoke the license and may recover the penal sum of the bond filed by the off-sale retailer.

Section 340.978 provides for the payment of certain annual fees to the Commissioner for the purpose of defraying expense incurred by him in carrying out the provisions of the Act.

It is the position of the Commissioner that he occupies a sort of passive role inasmuch as the minimum prices are set by the brand owners and wholesalers and under the terms of the Act become effective and binding regardless of any action he might take or fail to take. In this connection both defendants have urged that such wholesalers and brand owners are indispensable parties without whose presence this action cannot continue, for the reason that injunctive relief against the Commissioner would afford no protection to defendant Lang against prosecution under the state law. Motions to dismiss made on that ground were denied by the court, the court being of the view that injunctive relief against defendant Commissioner restraining the enforcement of the Minnesota law insofar as it conflicts with the Federal regulation will amply protect the defendant Lang. The role of the Commissioner is certainly not a passive one. It is within his power, if not his positive duty, to enforce the provisions of Chap. 400 and the regulations issued thereunder with reference to prices published in the Minimum Consumer Resale Price List, and he has enforced here such prices where they came in conflict with the maximum prices established under OPS price regulations. In fact, a reading of the Minnesota Law, Chap. 400, leads to the conclu-

sion that it is equally within his power to permit the sale of liquor and wine without considering the Minimum Price List where it is necessary to avoid practical difficulties or unnecessary hardship to any licensee. See M.S.A. §§ 340.975 and 340.976. A conflict between the Minimum Price List and OPS prices would seem to present just such a situation where the Commissioner on his own initiative could act to alleviate the dealer's predicament. Further, language used in an order of the Commissioner dated October 22, 1951, implies that he has not always asserted the position he maintains here. There he stated:

"Pursuant to the regulatory powers granted by the laws of Minnesota 1951, Chapter 400 to the Liquor Control Commissioner and in anticipation of *permissive* Federal Price regulation it is hereby ordered that the Minimum Consumer Resale Prices published July 1, September 1, and November 1, 1951, and remaining in effect on November 1 shall be increased by the addition of the Federal Excise tax applicable to each bottle and case which shall take effect on November 1, 1951, pursuant to the Act of Congress of the United States. (Italics supplied.)

\* \* \* \* \* \*

"*Note:* The passage of the Revenue Act by the Congress effective November 1, 1951, [26 U.S.C.A. Int.Rev.Acts], occurred at such a late date that it was impossible to obtain price filings from brand owners in time to publish prices of distilled liquors and wines on November 1, 1951, including the increased Federal excise taxes and *any markups which OPS may permit.* Therefore, the prices published July 1, September 1, and November 1, 1951, will remain in effect together with such additions ordered and authorized above until new price filings can be obtained. All brand owners and agents will be required to file new prices on an emergency basis and it is anticipated that a new complete price book will be published on or shortly after December 1, 1951, to replace the three preceding publications and this order." (Italics supplied.)

The inference from these words is certainly that the Commissioner regarded the

Minimum Price List prices as being subject to the prices established under OPS regulations. How otherwise is the use of the word "permissive" in the first paragraph and "any markups which OPS may permit" in the Note, to be construed. But irrespective of this, the court is of the opinion that because of the enforcement power vested in the Commissioner and exercised by him under the authority of the laws of Minnesota, he is amenable to the injunction provision of Section 706 (a) of the Defense Production Act of 1950, as amended, which provides: "Sec. 706 (a). Whenever in the judgment of the President any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of this Act, he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the President that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order, with or without such injunction or restraining order, shall be granted without bond." 50 Appendix, U.S.C.A. § 2156.

When in the exercise of his enforcement power, the Commissioner violates, or causes another to violate the above Act, as is the case here, he can and must be enjoined. It is no defense, as Commissioner argues, that neither the Minnesota Law nor the Defense Production Act, requires the defendant Lang to stay in business if she cannot comply with the provisions of both Acts. Such an injunction obviates the necessity of defendant Lang choosing to follow the state minimum price law at the risk of breaching the federal maximum price law. Why defendant Lang chose to follow the state law is readily revealed when, according to the affidavit attached to the motion for a preliminary injunction, her selling at retail liquors and wines at prices set by the Minnesota Minimum Consumer Resale Price List and in excess of the maximum prices established by federal regulations, amounted to approximately $5,000.00 per month in overcharges since July 1, 1951.

4. We come next to a consideration of the various defenses raised here, and shall consider first those which attack the validity of the General Ceiling Price Regulations. The Commissioner asserts that the GCPR and CPR 78 and SR 2 to CPR 78 were not validly promulgated in accordance with Section 402 of the Defense Production Act of 1950, for the reason that ceilings were not first established on materials and services comprising a substantial part of all sales at retail and materially affecting the cost of living, and that under the Act this must be done before a general price ceiling may be established.

This court has no jurisdiction to consider the merits, if any, of the defenses attacking the validity of any regulation or order relating to price controls. Section 408 (d) is specific on this point: "(d) * * * The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have *exclusive* jurisdiction to determine the validity of any regulation or order relating to price controls issued under this title, and of any provision of any such regulation or order. Except as provided in this section, *no court, Federal, State, or Territorial,* shall have jurisdiction or power to consider the validity of any such regulation or order relating to price controls, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this title authorizing the issuance of such regulations or orders, or any provision of any such regulation or order, or to restrain or enjoin the enforcement of any such provision." (Italics supplied.) 50 Appendix, U.S.C.A. § 2108 (d).

In view of the exclusive jurisdiction vested in the Emergency Court of Appeal by this section, defendants are precluded from raising such defenses in this action. It was so held in Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339, and Yakus v. United States, 321 U.S. 414, 64 S. Ct. 660, 88 L.Ed. 834. Moreover, the Defense Production Act of 1950, as amended, has provided the procedure whereby the validity of the regulations of the Office of Price Stabilization may be challenged.

Section 407 of the Act provides for the filing with the President of a protest to the order or regulation at any time within six months after its effective date, or, in the case of new grounds arising after the effective date of any such regulation or order, within six months after such new grounds arise. 50 Appendix, U.S.C.A. § 2107.

In Section 408 there is provided a method of appeal to the Emergency Court of Appeals from a denial of a protest to such regulation or order by the President, and a review of the judgment of the latter court by the Supreme Court of the United States. 50 Appendix, U.S.C.A. § 2108.

■ Defendant Commissioner further claims not to be a "person" within the meaning of the Defense Production Act of 1950, as amended, so as to enable him to avail himself of the means therein provided for testing the validity of the regulations. In this connection he seeks by his counterclaim an order of this court enjoining the operation, enforcement and execution of the Defense Production Act of 1950 and asks that this controversy be determined by a district court of three judges. Deferring for the moment discussion on this latter question, the court does not agree that defendant Commissioner is not a "person" within the meaning of the Act because he is not engaged in the business of securing or distributing liquors and wines. "Person" is defined by Section 702 as used in the Act as follows: "(a) The word 'person' includes an individual, corporation, partnership, association, or any other organized group of persons, or legal successor or representative of the foregoing, and includes the United States or any agency thereof, or any other government, or any of its political subdivisions, or any agency of any of the foregoing: Provided, That no punishment provided by this Act shall apply to the United States, or to any such government, political subdivision, or government agency."

When this section is read in conjunction with Section 706 (a) of the Act, heretofore quoted, it is quite apparent that the defendant Commissioner comes within the classification of those who can be enjoined.

■ The court is of the opinion that both defendants could and should have availed themselves of the protest procedure prescribed by Section 407 of the Act if they desired to contest the validity of any regulation or if they felt themselves aggrieved. Upon a proper showing, there is still available to them a method of testing the validity of a regulation under Section 408 (e) (1) and (2), which provides that "the defendant" in any criminal or civil proceedings, brought pursuant to Section 706 of the Act, may apply to the court for leave to file a complaint with the Emergency Court of Appeals against the President setting forth objections to the validity of any provision which the defendant is alleged to have violated; provided, however, that such objection to the order or regulation be made in good faith and there is substantial excuse for defendant's failure to present such objections in a protest filed in accordance with Section 407. The court may grant a stay pending the determination of such appeals, but must issue a temporary injunction or restraining order enjoining or restraining, during the period of the stay, violations of any provisions of the regulation or order involved in the proceeding. The Commissioner can certainly not deny that he has such status as a defendant here.

■ 5. This court has no jurisdiction to grant the injunction asked in the counterclaim of defendant Commissioner. Section 408 (d) heretofore quoted prohibits this court, and also a three-judge court constituted under 28 U.S.C.A. §§ 2281–2284, from granting such an injunction. Although defendants can attack the constitutionality of the Act itself, the court cannot contrary to the prohibitions of the said Section 408 (d) grant an injunction against the enforcement of the price regulations by enjoining the enforcement of the Defense Production Act itself. Section 204 (d) of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 924 (d), which is almost identical to the provisions of Section 408 (d) of the Defense Production Act of 1950, was considered by the United States Supreme Court in Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 1022, 87 L.Ed. 1339. There

the court said: "By this statute Congress has seen fit to confer on the Emergency Court (and on the Supreme Court upon review of decisions of the Emergency Court) equity jurisdiction to restrain the enforcement of price orders under the Emergency Price Control Act. At the same time it has withdrawn that jurisdiction from every other federal and state court. There is nothing in the Constitution which requires Congress to confer equity jurisdiction on any particular inferior federal court. All federal courts, other than the Supreme Court, derive their jurisdiction wholly from the exercise of the authority to 'ordain and establish' inferior courts, conferred on Congress by Article III, § 1, of the Constitution. Article III left Congress free to establish inferior federal courts or not as it thought appropriate. It could have declined to create any such courts, leaving suitors to the remedies afforded by state courts, with such appellate review by this Court as Congress might prescribe. (Citing cases). The Congressional power to ordain and establish inferior courts includes the power 'of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good'. (Citing cases). In the light of the explicit language of the Constitution and our decisions, it is plain that Congress has power to provide that the equity jurisdiction to restrain enforcement of the Act, or of regulations promulgated under it, be restricted to the Emergency Court, and, upon review of its decisions, to this Court. Nor can we doubt the authority of Congress to require that a plaintiff seeking such equitable relief resort to the Emergency Court only after pursuing the prescribed administrative procedure." See also Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, to the same effect; Case v. Bowles, 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552; and Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892. Nor is there any apparent merit to the contention of Commissioner, submitted in his re-amended answer that there is a denial of due process in violation of the 5th Amendment to the Constitution. This contention is disposed of in Taylor v. Porter, 156 F.2d 805, an Emergency Court of Appeals decision by Judge Maris, who wrote the opinion of the majority in the Lockerty case which was a three-judge court originally, see Lockerty v. Phillips, D.C., 49 F.Supp. 513, 515. In the Lockerty case he had this to say: "We conclude by section 204 (d) Congress has withdrawn from this court the jurisdiction and power to grant the injunction prayed for. That Congress had power thus to limit the jurisdiction of an inferior court of the United States is settled." (Citing cases.)

The complaint was dismissed for want of jurisdiction. The Yakus case, supra, [321 U.S. 414, 64 S.Ct. 670] construed Sections 203–204 of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, §§ 923, 924. They were sections similar to Sections 407–408 of the Defense Production Act of 1950, as amended. It was claimed that the Fifth Amendment guaranteeing due process was violated. I am not going to attempt a review of that decision here, except to say that Chief Justice Stone stated the question in this fashion: "We come to the question whether the provisions of the Act, so construed as to deprive petitioners of opportunity to attack the regulation in a prosecution for its violation, deprive them of the due process of law guaranteed by the Fifth Amendment."

The court held there was no deprivation of due process.

5. That the defense of unconstitutionality can be raised in a proceeding such as this is made clear by Case v. Bowles, supra, but the federal question presented must be a substantial one. In California Water Service Co. v. Redding, 304 U.S. 252, 58 S.Ct. 865, 866, 82 L.Ed. 1323, a district court of three judges was convened in a suit to enjoin enforcement of federal statutes on the ground of unconstitutionality. The District Court held, and was affirmed by the Supreme Court, that it was without jurisdiction since no substantial federal question was presented and it must therefore dismiss the bill. The court said: " * * * It is therefore the duty of a district judge, to whom an application for

an injunction restraining enforcement of a state statute or order is made, to scrutinize the bill of complaint to ascertain whether a substantial federal question is presented, as otherwise the provision for the convening of a court of three judges is not applicable. Ex parte Buder, 271 U.S. 461, 467, 46 S.Ct. 557, 559, 70 L.Ed. 1036; Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152. We think that a similar rule governs proceedings under Section 3 of the Act of August 24, 1937, 28 U.S.C.A. § 380a, as to the participation of three judges in passing upon applications for injunctions restraining the enforcement of federal statutes upon the ground of constitutional invalidity. * * * The lack of substantiality in a federal question may appear either because it is obviously without merit or because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject. * * * "

That there is no substantiality in the defense presented here appears from the numerous authorities the court has considered in connection with this matter. The Defense Production Act is within the authority granted Congress to regulate prices by virtue of its war powers. In Woods v. Cloyd W. Miller Co., 333 U.S. 138, 68 S.Ct. 421, 92 L.Ed. 596, federal rent control was sustained under the War Power of Congress. The court there said in 333 U.S. at page 141, 68 S.Ct. at page 423: "We conclude, in the first place, that the war power sustains this legislation. The Court said in Hamilton v. Kentucky Distilleries and Warehouse Co., 251 U.S. 146, 161, 40 S.Ct. 106, 110, 64 L.Ed. 194, that the war power includes the power 'to remedy the evils which have arisen from its rise and progress' and continues for the duration of that emergency. Whatever may be the consequences when war is officially terminated, the war power does not necessarily end with the cessation of hostilities. We recently held that it is adequate to support the preservation of rights created by war time legislation, Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 67 S.Ct. 1129, [91 L.Ed. 1375]. But it has a broader sweep. In Hamilton v. Kentucky Distilleries and Warehouse Co.,

supra, and Ruppert v. Caffey, 251 U.S. 264, 40 S.Ct. 141, 64 L.Ed. 260, prohibition laws which were enacted after the Armistice in World War I were sustained as exercises of the war power because they conserved manpower and increased efficiency of production in the critical days during the period of demobilization, and helped to husband the supply of grains and cereals depleted by the war effort. Those cases followed the reasoning of Stewart v. Kahn, 11 Wall. 493, 20 L.Ed. 176, which held that Congress had the power to toll the statute of limitations of the States during the period when the process of their courts was not available to litigants due to the conditions obtaining in the Civil War."

In Jameson & Co. v. Morgenthau, 307 U.S. 171, 59 S.Ct. 804, 83 L.Ed. 1189, the Federal Alcohol Administration Act was attacked upon the ground that the Twenty-first Amendment to the Federal Constitution gives to the States complete and exclusive control over commerce in intoxicating liquors, unlimited by the commerce clause and that hence Congress has no longer authority to control the importation of these commodities into the United States. The same claim of exclusiveness of control over liquor is made here. The court there summarily dismissed this contention stating they found "no substance" therein.

In Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194, the court held that the power to prohibit the liquor traffic as a means of increasing war efficiency without providing for compensation, is no more limited by the Fifth Amendment than a like exercise of a State's police power would be limited by the Fourteenth Amendment. I think this decision disposes of the Commissioner's latest Amendment to his answer claiming violation of the Fifth Amendment to the Constitution. True it is that the Hamilton case was decided before the passage of the Twenty-first Amendment, but this Amendment does not limit the war powers of Congress. See also Fleming v. Mohawk Wrecking &

Lumber Co., 331 U.S. 111, 67 S.Ct. 1129, 91 L.Ed. 1375.

In United States v. Chicco, D.C., 59 F.Supp. 211, relied upon and quoted by defendant Commissioner to support his contention that the Twenty-first Amendment gives the States unlimited control over liquor, defendants were indicted for violations of price regulations issued pursuant to the Emergency Price Control Act of 1942, the specific violation being alleged sales of liquor in excess of the maximum permitted under existing regulations. Defendants moved to quash on the grounds that the Twenty-first Amendment prohibits Congress from passing any law regulating or interfering in any manner with the sale or delivery within a state of intoxicating liquor. Defendant Commissioner quotes the following from the above opinion, at page 216 of 59 F.Supp.: " * * * If it should be conceded that the State has the unlimited power to fix maximum and minimum prices for intoxicating liquors sold in this State, if it elects to use such power, that does not mean that the federal government, under it War Powers, may not establish maximum prices for intoxicating liquors in the absence of state action, or in the case of state action, if the two sets of regulations do not conflict."

That the court in the Chicco case was not presented with the same question we have here, is clearly shown by the following portion of the opinion not quoted by defendant which indicates that had the precise question been presented to the court there, that court would undoubtedly have found contrary to defendant's contentions:

"There is no contention that the State has prescribed prices below which intoxicating liquor may not be lawfully sold and that the Administrator by regulation has reduced those prices, nor has it been shown that the Regulation interferes with the State's enforcement program respecting the manufacture, sale, use or handling of alcoholic liquors. I am of the opinion that Congress has all of the power and control of alcoholic liquors that it had before the adoption of the 18th Amendment, except that it has no power to transport or import intoxicating liquors into a state for delivery or use therein in violation of the laws thereof or to authorize others to do so. But for that qualification the power of Congress respecting alcoholic liquors is the same as it was before the adoption of the 18th Amendment. As held in Hamilton v. Kentucky, etc., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194, the prohibition of traffic in alcoholic liquors as a war measure is within the War Powers of Congress. *If the sale of alcoholic liquors can be prohibited entirely as a war measure, then what good reason exists to say that a reasonable price therefor may not be prescribed as a condition to traffic therein?* There is no good reason for such a position, since the greater includes the lesser power.

"Beyond question, Congress, in the exercise of its War Powers, can regulate prices during a national emergency created by a state of war; and there is no necessary conflict between the War Powers provision of the Constitution and Section 2 of the 21st Amendment, except perhaps in the particular above stated. If it be admitted arguendo that an irreconcilable conflict could arise, a situation which does not now exist, then the necessities of the situation would require that the War Powers clause take precedence during the existence of the national emergency. *The War Powers of Congress are exerted* to save the nation from possible destruction and that is the highest duty of the Government, because if the nation falls the Constitution will fall with it; and, in such a situation, those claiming the protection of the Constitution would find scant, if any, security therein." (Italics supplied.)

Contentions that the Twenty-first Amendment bars price control of intoxicating liquors under the Emergency Price Control Act were rejected in the cases of Jatros v. Bowles, 6 Cir., 143 F.2d 453; Barnett v. Bowles, Em.App., 151 F.2d 77, certiorari denied, 326 U.S. 766, 66 S.Ct. 168, 90 L.Ed. 462; Dowling Bros. Distilling Co. v. United States, 6 Cir., 153 F.2d 353; Collins v. Bowles, Em.App., 152 F.2d 760, all four of which cases are cited by defendant Commissioner. It is from the Collins case that

the Commissioner draws his argument that there is no conflict between the State Fair Trade Act here and OPS regulations because the Minnesota law is a minimum price law and does not relate to maximum prices. That case gave no consideration to the result where the prices under the two laws conflict, as they do here. It should also be noted that in the Dowling case, Judge Simons speaking for the court held that the alleged unconstitutionality of the Emergency Price Control Act did not provide a reasonable and substantial excuse for failure to protest maximum price regulation to the Administrator, and hence denial of stay of proceedings to file suit in the Emergency Court of Appeals to test the validity of the regulations under which defendants were indicted was not an abuse of discretion where constitutional validity of the Act was open to challenge at the trial.

In the Jatros case the court said at page 455 of 143 F.2d: "Moreover, the Price Control Act rests upon the war power. The Congress has constitutional authority to prescribe commodity prices as a war emergency measure and the Act was adopted in the exercise of that power. Neither expressly nor by implication was the war power abrogated or limited by the Twenty-first Amendment. Certainly, if there was power to impose national prohibition during war in 1918 there is power to invoke regulations to prevent war-time inflation and its disruptive causes and effects in 1944."

In the Barnett case the Emergency Court of Appeals said the purpose of the Emergency Price Control Act is to achieve a comprehensive regulation of the price of commodities in order to assure in the national emergency an adequate supply of goods for the public at fair prices. The court also said that the regulations were presumed to be valid.

Just what aid the defendant Commissioner obtains from these four decisions I fail to see.

A parallel in the factual situation with this case is found in Bowles v. Bergman,[1] Fed.Dist.Court, N.D. New York, No. 1544, May 19, 1944, where the New York Commissioner of Agriculture & Markets was enjoined from establishing minimum milk prices in excess of the maximum price established by the Federal Price Administrator. To the same effect see also Waldron & Son v. Milk Control Board, a New Jersey case found in 131 N.J.L. 267, 35 A.2d 27, affirmed per curiam, 131 N.J.L. 388, 36 A.2d 920. In the Waldron case the State Director of Milk Control issued an order increasing the minimum price which dairies could pay to farmers for fluid milk from $3.60 per hundredweight to $3.83 per hundredweight. This latter price was the ceiling price fixed by OPA. The State Director did not increase the prices which dairies could charge because the existing minimum price under State regulation was already at OPA ceiling price levels. A number of dairies attacked the order issued by the State Director as invalid, first, because the price established was too low to give farmers a fair return, and second, because the increase in the farm price was not accompanied by an increase in the dairy price. The court held that these objections were without merit since the State Director of Milk Control had no power to fix minimum prices above OPA ceilings. The court noted that the Director's statutory power was subject to the ceiling prices prescribed by OPA. If these ceiling prices were not sufficiently high, the court indicated that recourse should be had by the distributors to OPA. Finally the court pointed out that it was permissible for the State Director to raise minimum prices to OPA ceilings, since to that extent State and Federal law would not conflict. The court's comments on these points are relevant at page 29 of 35 A.2d:

"The Federal bureau has merely prescribed ceiling or maximum prices—a limited measure of price control. It has but fixed a level above which prices may not rise. Under the ceiling, the State authority is free to function within the

---

1. No opinion for publication.

framework of the State law. There is a field of concurrent power in which the state may legislate until the authority is actually exercised by the Congress.

\* \* \* \* \* \*

" \* \* \* The Director's statutory power is subject to the 'ceiling' price prescribed by the Federal Office of Price Administration. This Federal regulation is a measure deemed essential to our national war economy—an application of a policy designed to avert ruinous inflation and scarcity of a commodity essential to the common defense and security; and in this field the authority of the Congress is supreme. \* \* \* If distribution is complicated by the Federal regulation, and thereby some of the distributors cannot carry on business at a profit, recourse must needs be had to the Federal tribunal charged with the administration of the policy.

\* \* \* \* \* \*

"There is a field of concurrent power in which the state may legislate until the authority is actually exercised by the Congress. \* \* \* When the Congress legislates in a field common to both the Federal and State sovereignties, the Federal act supersedes all inconsistent state legislation. \* \* \*"

 The considerations present in the Waldron case are equally applicable here. In this case, as in the Waldron case, the State Liquor Commissioner's authority is "subject to the ceiling price", prescribed by OPS. Such a result is, of course, required by the United States Constitution. Indeed, if the authority of the State Liquor Commissioner were not subject to OPS ceilings, the net effect would be that a State could vitiate Federal price control at will. If OPS ceiling prices are deemed too low, there are available detailed and adequate procedures prescribed by Federal law and OPS regulations to afford necessary relief. Recourse to OPS rather than to the State law is the proper method in such cases.

 Where as here Congress has enacted legislation authorized by its granted powers, and where at the same time a state has a conflicting law which but for the Congressional Act would be valid, the Constitution marks the course for the courts to follow. Article VI provides that the "Constitution, and the Laws of the United States \* \* \* made in Pursuance thereof \* \* \* shall be the supreme Law of the Land". Long ago, Mr. Justice McKenna in Southern Railway Co. v. Reid, 222 U.S. 424, 32 S.Ct. 140, 144, 56 L.Ed. 257, a case involving the Act to Regulate Commerce, had this to say with reference to the conflict of authority—state and federal: "If the carrier obey the state law, he incurs the penalties of the Federal law; if he obey the Federal law, he incurs the penalties of the state law. Manifestly one authority must be paramount, and when it speaks the other must be silent. We can see no middle ground."

In conclusion as bearing upon the contention that the Commissioner is not subject to the Act, I desire to call attention to the case of Parker v. Fleming, 329 U.S. 531, 67 S.Ct. 463, 465, 91 L.Ed. 479, wherein among other things Mr. Justice Black said: "Thus it appears that the Administrator and the Emergency Court of Appeals have determined that the question of whether a person is 'subject to' the Act is dependent to some extent upon whether the order immediately, substantially and adversely affects him, as well as whether the order requires or prohibits action by him."

It would serve no useful purpose to further extend this memorandum order, which is already too long, by the citation and quotation of additional authority, of which there is a wealth. Suffice it to say that the absence of a substantial federal question here makes it unnecessary to convene a three-judge court to pass upon the constitutionality of the Defense Production Act of 1950, as amended. The defense of unconstitutionality is obviously without merit and its unsoundness has been demonstrated by decisions of the United States Supreme Court and courts of appeal so as to foreclose the subject.

The motion for a preliminary injunction as prayed is granted. The counter-claim of the defendant Commissioner is dismissed. All motions made by the defendants and the relief sought in their answers are overruled and denied.

Counsel for plaintiff may submit Findings of Fact and Conclusions of Law consistent with this order and in compliance with Rule 65 of the Rules of Civil Procedure, 28 U.S.C.A.