40 N.J. Super. 318 (1956)
123 A.2d 16
IN THE MATTER OF THE APPLICATION OF WELSH PRODUCERS COOPERATIVE MILK MARKETING ASSOCIATION. INC., FOR A LICENSE TO OPERATE AS A MILK DEALER IN THE STATE OF NEW JERSEY.
Superior Court of New Jersey, Appellate Division.
Argued May 7, 1956.
Decided June 6, 1956.
*320 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Edward W. Currie argued the cause for appellant, Welsh Producers Cooperative Milk Marketing Association, Inc.
Mr. David D. Furman, Deputy Attorney-General, argued the cause for respondent, Floyd R. Hoffman, Director of the Office of Milk Industry (Mr. Grover C. Richman, Jr., Attorney-General of New Jersey, attorney; Mr. Joseph Lanigan, Deputy Attorney-General, on the brief).
The opinion of the court was delivered by FRANCIS, J.A.D.
The Director of the Office of Milk Industry refused to grant a milk dealer's license to appellant, Welsh Producers Cooperative Milk Marketing Association, Inc., under N.J.S.A. 4:12-1 et seq. The propriety of his action is challenged by this appeal.
The Milk Control Act invests the Director with broad authority to fix "the price at which milk is to be bought, sold, or distributed"; to "regulate conditions and terms of sale"; to "supervise, regulate and control the entire milk industry in the State of New Jersey, including the production * * * sale or resale," and to do everything necessary "to control or prevent unfair, unjust, destructive or demoralizing practices" in the industry. N.J.S.A. 4:12A-21. More specifically, he may fix the minimum prices to be paid to the producer and the resale prices to be charged by milk dealers to other milk dealers and to consumers. N.J.S.A. 4:12A-22.
Milk dealers are required to be licensed and they are forbidden to handle or sell in this State milk which is obtained from a producer or other milk dealer directly or *321 indirectly for a price less than the minimum fixed by the Director. N.J.S.A. 4:12A-28, 29. And it is illegal for a licensee to operate under any "mutual or secret agreement, arrangement, combination, contract or common understanding, with any other licensee or person, firm, association or corporation, whereby the price for milk to be paid to producers in this State is reduced * * *." N.J.S.A. 4:12A-30.
A milk dealer is defined to be any "person who sells * * * milk, including on consignment or for the account of a producer, or who purchases milk from producers or other milk dealers * * * and who, in addition thereto, pasteurizes in his own plant or bottles in his own plant for sale in this State * * *. Any dairy cooperative association organized under any law of this or any other State and engaged in this State in the handling of milk in this State, as hereinafter defined, is hereby declared to be a milk dealer * * *." N.J.S.A. 4:12A-1. (Emphasis ours)
Section 31 expressly declares that the act shall not prevent "a producer co-operative * * * corporation approved by the director, which sells the milk of or for its members * * * from blending the proceeds of all its or their net sales either within or without the State, and so paying its members * * *." N.J.S.A. 4:12A-31. The effect of this provision is that such a cooperative is not bound by the minimum prices set by the Director to be paid to producers. Since the organization would be composed of producers and would operate in their interest, the Legislature obviously did not intend to require it to pay the minimum fixed prices to the producers in the first instance, but rather to enable them by pooling their milk to sell it on a cooperative basis and to distribute the net proceeds of the sales.
Producer as used in the statute means "[a]ny person producing milk entirely for sale to a milk dealer or processor except for the milk produced for the use of himself and his family and the use of his employees and their families." N.J.S.A. 4:12A-1.
*322 Prior to the events to be discussed herein, the Director had established minimum prices to be paid by dealers to producers and also minimum resale prices to be charged by them to subdealers, stores and consumers.
Welsh Farms, Inc., is a licensed milk dealer, and in the course of its business regularly bought milk from 62 producers in northern New Jersey at the fixed minimum prices. Apparently in the fall of 1954 the Director indicated that he was contemplating the elimination of resale price control. Upon receipt of this information Welsh Farms, Inc. says it feared resale decontrol would cause a serious monetary loss if the mandate for minimum prices to the producer remained in existence. So it addressed a letter to its 62 producers advising them of the impending action of the Director. They were told also that if the resale prices were cancelled, Welsh Farms, Inc. could not continue to buy New Jersey milk at O.M.I. prices.
Two possible remedies were pointed out: (1) that Welsh Farms, Inc. would stop buying New Jersey milk (see Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935)), and (2) the immediate formation by the producers of a cooperative marketing association "which would then resell to us at prices we can afford to pay * * *." And the ominous statement was made that if a prompt solution could not be found, it would be necessary immediately to send out formal 30-day notices cancelling the purchasing arrangement between them. The letter was signed by the president of Welsh Farms, Inc., and concluded as follows:
"A general producers meeting will be held at the Long Valley Inn on Thursday, December 7th, at 7:30 p.m. Every producer should attend."
The record contains other evidence of like psychological and real pressure on the farmer producers for the formation of a cooperative.
The meeting mentioned and some later ones eventuated in the incorporation in February 1955 of the appellant *323 Welsh Producers Cooperative Milk Marketing Association, Inc.
On February 17, 1955 Welsh Farms, Inc. and Welsh Producers Cooperative Milk Marketing Association, Inc. entered into a contract which was to become effective upon the removal of resale prices on milk and milk products by the Director. (This contingency had already happened by order dated February 15.) By its terms the Cooperative agreed to sell, and the dealer (Welsh Farms, Inc.) agreed to buy, all the milk of its members.
It provided that the prices to be paid by the dealer would be "negotiated on or before the 10th day of each month following that in which the milk is delivered." In no case was the price to be less than the blend price established for all milk under Federal Order No. 27 (the regulation of the United States Secretary of Agriculture, which fixed prices of interstate sales for producers at lower levels than those of our Office of Milk Industry). And the Cooperative expressly waived on behalf of the producers any notices with respect to the previous purchasing arrangements and "any rule or regulation of the Director of Milk Control or the Office of Milk Industry of the State of New Jersey in respect to previous purchasing arrangements."
A separate agreement was made between each producer and the Cooperative. Under it the producer appointed the Cooperative as the exclusive sales agent and agreed to deliver all of his milk daily (except a small portion for non-sale use) to the plant of Welsh Farms, Inc. The Cooperative was given the right to sell the milk at the price which in its sole judgment constituted the best price obtainable, but in no event less than the blend price fixed for all milk under Federal Order No. 27. All of the receipts were to be pooled and prorated among the producers after deduction of cost of maintaining the Cooperative.
Both of the Producer-Cooperative and the Cooperative-Dealer contracts were to terminate upon the re-establishment by the Director of such a schedule of resale prices as was effective immediately before their execution.
*324 As indicated, on February 15, 1955 resale prices were cancelled by the Office of Milk Industry. A week later the Cooperative applied for a milk dealer's license as a cooperative association under sections 28 and 31 of the act, supra. Without waiting for approval of the Director to its existence as a producer cooperative association, or for the issuance of the license, the parties began to operate under the contract described.
The Director conducted a hearing on the license application. There the true relationship between Welsh Farms, Inc. and the Cooperative was more fully developed. It appeared that Welsh Farms, Inc. and the Welsh Cooperative had negotiated a lease under which the Cooperative would lease the plant and facilities of Welsh Farms, Inc. In turn, the Cooperative named Welsh Farms, Inc. as its agent to supervise, manage and control the Cooperative. In effect, this meant that the management of Welsh Farms, Inc. would continue to manage and control its plant and facilities as it was currently doing, except that it would operate as the agent of the Cooperative.
It became plain that the Cooperative was the brain child of Welsh Farms, Inc. and not of the producers, and that it was designed solely to avoid the minimum producer price controls. To make avoidance effective, it was necessary to obtain a dealer's license for the producers as a Cooperative. But by reason of the agency stipulation the management of Welsh Farms, Inc. was in reality in control of its own company and of the Cooperative as well. And in "negotiating" prices to be paid to the Cooperative for the producers' milk, Welsh Farms, Inc. in substance was fixing them unilaterally, subject only to the condition that they should not be below those set out in Federal Order No. 27. Thus, by the agreement, price control of these producers' milk was transferred out of the hands of the Director and into those of Welsh Farms, Inc.
The prime mover in the plan to establish the Cooperative was the president of Welsh Farms, Inc. Also, he was its most active protagonish and principal witness at the hearing. *325 It is interesting to note the following question and answer put to him by the Director:
"Q. In the event that you are given a license for your Producers Cooperative Association you could price milk at any prices regardless of the prices set-through an agreement  set by the Office of Milk Industry? In other words, the Office of Milk Industry would not have any authority over what price you paid producers? A. That is correct." (Emphasis added)
The president and vice-president of the Cooperative appeared as witnesses. Examination of their testimony demonstrates that they had little to do with its creation, little understanding of the basic problems involved, and that they were more formal than real officers of the organization. By way of illustration, this interrogation of the President is revealing:
"Q. In what way will this enable you to hold your market? A. Well, Mr. Cleary [president of Welsh Farms, Inc.] will be able to continue to handle our milk, to sell our milk. He can afford to buy it at a price he can handle it at.

* * * * * * * *
Q. What is your opinion as to what change, if any, there has been in the situation by reason of the removal of the resale prices? A. I just couldn't say." (Insertion ours)
Similarly, the examination of the vice-president shows:
"Q. Your market was threatened if you didn't do it? You were threatened with being dropped if you didn't form this Cooperative, is that correct? A. Well, I should say yes. As we sort of got in it (sic).
Q. The point I am making is you were theatened if you didn't form a Cooperative you would get a thirty day notice? A. We would get a thirty day notice.

* * * * * * * *
Q. The question I am asking you is did you of your own opinion and of your own free will and thinking, did you without being threatened by anybody sign these Articles of Incorporation and the application for a dealer's license? A. No, I didn't think of it myself, not altogether, no."
On the basis of all of the proof, the Director felt that the producers involved had not organized a cooperative in *326 the statutory sense. He took the view that they had been formed into one by Welsh Farms, Inc., and that the prices they would receive would not be the product of arms' length bargaining between their association and Welsh Farms, Inc., but would be those resulting from the resale price of their milk, as decided upon by the latter, after deduction of its profit and costs of operating the Cooperative. And he concluded that the aim of Welsh Farms, Inc. was to circumvent the Office of Milk Industry producer minimum prices. In fact, although the president of Welsh Farms, Inc. asserted that an endeavor would be made and had been made successfully in most of their operations since the formation of the Cooperative to return prices above the Director's minimums, in some instances the prices paid were below that standard. Consequently, the application for a dealer's license as a cooperative association was denied. In our judgment, the action was correct.
The Director is authorized to deny a dealer's license when the applicant "has committed any act injurious to trade or commerce, or any act which may demoralize the price structure of milk or interfere with an ample supply of milk for the inhabitants of this State." N.J.S.A. 4:12A-35(4).
It seems evident from the record here that the scheme fostered and brought to fruition by Welsh Farms, Inc. has the potentiality for complete destruction of control of producers' minimum prices by the Office of Milk Industry. If all the dealers in the State, who occupy the market status of Welsh Farms, Inc., were to pressure the farmers into a pseudo cooperative which would then bargain away the power to fix the prices for their milk (except for the limitation of a federally fixed price on interstate sales which is lower than the New Jersey standard), the public purpose of the Milk Control Act would be frustrated and the authority of the Director emasculated.
However, appellant calls attention to the fact that the milk producers did form a cooperative association and receive a corporate charter as such from the State. It then points out that Section 1 of the act says, "Any dairy co-operative *327 association * * * is hereby declared to be a milk dealer." (Emphasis added) From these premises the argument is advanced that use of the unqualified word "any" by the Legislature manifests an intention to require the grant of such a license to any cooperative which in form appears to be such.
There is no legal merit in the claim. It overlooks the requirement that to be free of the Director's price controls the cooperative must have his approval. Obviously, the legislative purpose was to permit farmer producers to band together and to act cooperatively as their own dealer so as to assist them in obtaining, if possible, better prices for their milk than if their sales were limited to an independent dealer who would pay only the Office of Milk Industry minimums.
The discretion to be exercised by the Director in approving or disapproving the cooperative is not an uncontrolled or unregulated one. The plain import of section 31 is that a real and not a bare bones automaton cooperative must exist. And beyond this the standards by which the granting of the dealer's license is to be appraised are fully set forth in subdivisions (1) through (12) of section 35, supra.
It has been said a number of times by our courts that the production and distribution of milk are so intimately identified with the public health and welfare as to warrant price regulation. Abbotts Dairies, Inc., v. Armstrong, 14 N.J. 319, 330 (1954); B.R. Waldron & Sons Co. v. Milk Control Board, 131 N.J.L. 267, 270 (Sup. Ct. 1944). The Director is under a duty to make the legislative policy effective. In the pursuit of that duty, he is specifically authorized to deny a dealer's license where the applicant is guilty of any act which may demoralize the price structure of milk or interfere with an ample supply thereof. Section 35, supra.
In an effort to protect the farmer producers of our State, whose operation is at the heart of the industry, minimum prices to be paid to them have been established. No substantial *328 proof is advanced that they are arbitrary or unwarranted or represent an unreasonable return. Nor can they be declared invalid for intrastate transactions because they differ from those promulgated by the Secretary of Agriculture of the United States. To sanction a device of the type presented to the Director in this case would be to subvert both the spirit and the clear purpose of the act.
The order is affirmed.